PEOPLE *v.* MINNEY.

1. CRIMINAL LAW — TRIAL — INSUFFICIENT EVIDENCE — DIRECTING VERDICT,
   If, on the trial of a person accused of crime, it appears that the evidence is insufficient to warrant a conviction, the court, as a matter of law, should direct a verdict for defendant.

2. SAME — APPEAL — REVIEW — EVIDENCE — VERDICT OF GUILT BASED ON INCOMPETENT EVIDENCE,
   An appellate court, after an examination of the evidence, will not determine that it was insufficient to justify a verdict of guilty, where it appears that on the trial incompetent and damaging evidence was submitted for the consideration of the jury, and that neither the jury nor the trial court had passed upon defendant's innocence or guilt with such evidence eliminated.

3. SAME — EVIDENCE — INTENT — PROOF OF OTHER OFFENSES TO SHOW INTENT.
   On the trial of a person accused of the crime of mutilating a horse by cutting out its tongue, proof of the act is sufficient to establish the malicious intent, if done by a sane person; and evidence that respondent had been guilty of other acts of a similar nature was incompetent.

4. SAME—ANIMALS—MUTILATION—MALICE.
   Under the statute (section 11581, 3 Comp. Laws), providing a penalty for the mutilation of animals, malice toward the owner or custodian of the animal is an essential element of the crime; it is not necessary to show expressed malice, but it may be shown by the character of, and the circumstances surrounding, the crime.

Error to Berrien; Coolidge, J. Submitted November 19, 1908. (Docket No. 168.) Decided March 3, 1909.

Max Minney was convicted of mutilating a horse in violation of 3 Comp. Laws, § 11581, and sentenced to imprisonment for not less than two nor more than five years in the State prison at Jackson. Reversed.

*Gore & Harvey*, for appellant.

*Charles E. White*, Prosecuting Attorney (*Ira W. Riford*, of counsel), for the people.

Respondent was convicted under section 11581, 3 Comp. Laws, of mutilating a horse belonging to one Murphy by cutting off its tongue.   The mutilation occurred during the night of September 19, 1907, while the horse was in its owner's barn.   Respondent had lived in the vicinity for more than 20 years.   For two years prior to September 19th, he lived in the family of one Lucius M. Hogue, a farmer.   For about four weeks respondent had been working with the team belonging to Mr. Hogue, assisting in the construction of a large dam across the river St. Joseph at Berrien Springs.   The distance between Berrien Springs and Mr. Hogue's residence was seven miles, over a hilly and sandy road.   Mr. Murphy did not live on this road, but about one mile from it, on another road which led into this one.   Respondent left work on the dam at the close of the day's work, stating that one of his horses showed signs of lameness, and that he was going to Mr. Hogue's place to get another horse.   He had a room in Mr. Hogue's house, but had fixed a bed in the barn or stable where he oftentimes slept during hot weather.   He was seen by, and conversed with, some persons on the road between Berrien Springs and Mr. Hogue's.   He usually came home on Saturdays.   His usual time of arriving at Mr. Hogue's after his work was done, was about 9 o'clock.   The first Mr. Hogue saw or knew he was at home was when he came into the house about 4 o'clock in the morning.   He then told Mr. Hogue what he came for; that one horse showed signs of giving out, and he had come home to make the change.   Mrs. Hogue offered to get breakfast for him, but he said he had been to the pantry and helped himself, and that he must start if he got back in time to work.   He reached the dam about 6:30, in time for the day's work.   It is a fair inference

that he slept in the barn during the night. It was not shown that respondent had any motive for the commission of the crime. He had no ill will against Mr. Murphy, had done some work for him about two years before, and they had had no intercourse since. The only evidence of motive on the part of any one to commit such a crime was the testimony of Mr. Murphy that some time previous he had had trouble with two other persons, whose arrest he had caused. There is no evidence that respondent was seen in the vicinity of Mr. Murphy's house. The people gave some evidence tending to show that about 9 o'clock on the following morning the respondent told one of the men with whom he was working that there was a report that another horse had been mutilated, but that he did not know whose it was. There were some 150 men then working upon this dam, some of whom went to their homes overnight in the surrounding country, and others remained at the dam. The respondent gave no testimony. His counsel requested the court to direct a verdict of not guilty on the ground that the people had failed to establish his guilt. This the court refused, saying:

"Under all the circumstances, I think the case is one that the court can properly submit to the jury for their deliberation. The case may be very weak; indeed the evidence may be entirely insufficient upon which to base a conviction, and yet it does not follow that the court should direct a verdict for the defendant."

The case was submitted to the jury, and a verdict of guilty resulted.

GRANT, J. (after stating the facts). 1. After an examination of the evidence we will not determine that it is insufficient to justify a verdict of guilty. We may remark that the statement of the court that it should not direct a verdict when the evidence is entirely insufficient upon which to base a conviction is not correct. If upon the conceded or undisputed facts there is no ground to sustain a verdict of guilty, the court should direct a verdict. The

question then becomes one of law for the court. The statement by the court was made undoubtedly upon the entire evidence in the case, some of which was incompetent, and very damaging. With this incompetent evidence eliminated it is doubtful if there is evidence to justify a conviction. Appellate courts, however, should be very slow to discharge a prisoner convicted upon the entire evidence, where the jury has had no opportunity to pass upon his guilt or innocence with the incompetent testimony eliminated, and the trial court has not passed upon it.

2. Evidence was introduced to show that prior to September, 1907, tongues of horses of some four farmers had been cut out. These offenses were committed several months apart. Among them were two horses owned by one Kirk, living in the vicinity. A reward of $500 was offered for the arrest, and conviction of those guilty of mutilating Kirk's horses. Suspicion, for some reason pointing towards respondent, the sheriff employed a Chicago detective to work upon that case. This detective obtained work as foreman at the dam on September 9th. On September 12th he induced respondent to go to Chicago with him to assist in buying some horses. They arrived in Chicago about 7 o'clock in the morning, and spent the day in saloons, restaurants, theaters, and shows, returning to St. Joseph by boat the following night. The detective detailed minutely the talk he had with respondent, by which it was arranged that he (the detective) was to see one Tim Talbot and get $200 and pay him (respondent) for cutting the horses of one Johnson. While the detective was attempting to make this arrangement with respondent, he testified that respondent said "he had done them kind of jobs before," and said he had done the Kirk job. He also testified that respondent finally refused to do the job. The effect of this kind of testimony upon the jury can well be imagined. This was all the evidence tending to show the commission of a similar offense by respondent. It was proving another separate and distinct

offense, which had no tendency to prove motive or intent
any more than the commission of one burglarly or one
theft had a tendency to prove the commission of another
burglary or theft. All this occurred before the mutila-
tion of Mr. Murphy's horse, and when the detective and
officers were seeking to find the perpetrator of another
similar crime. Both trial and appellate courts have un-
doubtedly found much difficulty in determining whether
the case falls within the rule prohibiting evidence of other
crimes, or within the exception to it. To bring a case
within the exception it must appear that there is some
logical connection between the crime charged and the
other similar crimes which the people seek to establish
against the respondent upon trial. This court very thor-
oughly examined and discussed this subject in *People* v.
*Seaman*, 107 Mich. 348, where many authorities are cited,
and we deem it unnecessary to fully enter into the subject
again. After citing many authorities, this court said,
speaking through Chief Justice McGRATH:

"Some of these authorities would seem to be border
cases, but they illustrate the tendency of the courts to
allow the introduction of this class of testimony to repel
the inference that the cause was an accidental one, in
cases where such an inference might otherwise obtain.
Upon principle and authority it is clear that where a fe-
lonious intent is an essential ingredient of the crime
charged, and the act done is claimed to have been inno-
cently or accidentally done, or by mistake, or when the
result is claimed to have followed an act lawfully done for
a legitimate purpose, or where there is room for such an
inference, it is proper to characterize the act by proof of
other like acts producing the same result, as tending to
show guilty knowledge, and the intent or purpose with
which the particular act was done, and to rebut the pre-
sumption that might otherwise obtain"—citing many
authorities.

In the present case the commission of another like of-
fense was wholly unnecessary to show intent. The act
itself is one of those which, when proven, conclusively
establishes the malicious intent, if committed by a sane

person.   Any number of like offenses would not tend to show malicious intent any more than could one.   If the evidence established the fact that the respondent committed the deed, he would escape conviction only by a further finding by the jury that he was irresponsible by reason of insanity.   *People* v. *Mead,* 50 Mich. 228, is a good illustration of the admissibility of evidence referring to another like crime, but also having the tendency to establish the guilt of the crime charged.   The respondent was charged with burglary.   Several farm houses in the neighborhood had been entered the same night.   At the house of one Mitchell a plate of butter was taken.   The prosecution gave evidence showing that respondent, on the day after the burglary, picked up near the road fence the plate on which the butter had been carried from Mitchell's, claiming that he had just found it there.   The court says:

"It is objected that this evidence, if of any force at all, could only have tended to connect the respondent with the burglary at Mitchell's, or at least to have raised a suspicion that he was concerned in it.   The prosecution concede that if it had no tendency to connect the respondent with the particular offense for which he was on trial, it should not have been received; but their theory of the case was that the several burglaries were all substantially one transaction, and whatever tended to show participation in one was evidence of participation in all.   We agree in this view.   The proof was not given to show a different and distinct felony, but as tending to prove the very felony then under investigation; and its tendency to that end was for the jury."

The rule and the exception are ably discussed in *State* v. *Lapage,* 57 N. H. 245, a leading case upon the subject. The respondent in that case was charged with the murder of a young girl.   It was claimed by the State that the respondent lay in wait near a piece of woods, had committed the crime of rape, and then murdered the girl.   It was held competent to show that he had pursued other girls passing in this same locality, and about the same time;

that he had secreted himself in the woods, and suddenly appeared as girls walked along the highway, and pursued them; also to show obscene and vulgar language, used by him when he made inquiries about certain girls he saw passing the place at various times.   It was held incompetent to show that at another place, and upon another occasion, some time anterior to the offense charged, he had committed rape upon another girl.   The court in that case so tersely stated the established rule at page 289 that we quote it:

"(1) It is not permitted to the prosecution to attack the character of the prisoner, unless he first puts that in issue by offering evidence of his good character; (2) it is not permitted to show the defendant's bad character by showing particular acts; (3) it is not permitted to show in the prisoner a tendency or disposition to commit the crime with which he is charged; (4) it is not permitted to give in evidence other crimes of the prisoner, unless they are so connected by circumstances with the particular crime in issue as that the proof of one fact with its circumstances has some bearing upon the issue on trial other than such as is expressed in the foregoing three propositions."

Applying the principle established in the above cases, and those cited therein, to this case, the evidence received was wholly incompetent.   *People* v. *Henry*, 129 Mich. 100; *Brown* v. *State*, 26 Ohio St. 176; *People* v. *Jacks*, 76 Mich. 218.

For the same reason it was incompetent to show that the detective had induced the respondent to undertake the commission of another like crime, and especially since he finally refused to do it.   The entire testimony of this detective should have been excluded.   The proposition that a detective may deliberately induce for hire a suspected person to commit one crime for the purpose of showing that he committed another similar one finds no support in common sense, reason, or authority.

3. Error is assigned upon the instruction of the court that "it is not necessary that there be malice towards the

owner of the animal in a case like this." Malice is an essential ingredient of the crime, and under the clear weight of authority, both in England and the United States, the malice required must be toward the owner or custodian of the animal, and not malice toward the animal. The rule to be deduced from the authorities is that it is not essential to show expressed malice, but that the malice required may be shown by the character of, and the circumstances surrounding, the crime. 19 Am. & Eng. Enc. Law (2d Ed.), p. 641, and authorities there cited; note to *State* v. *Boies*, 68 Kan. 167 (1 Am. & Eng. Ann. Cas. 491); *United States* v. *Gideon*, 1 Minn. 292; *State* v. *Harris*, 11 Iowa, 414; *Chappell* v. *State*, 35 Ark. 345; *King* v. *Pearce*, 1 Leach, C. C. 527; *State* v. *Newby*, 64 N. C. 23; *State* v. *Beekman*, 27 N. J. Law, 124; 2 East, P. C. p. 1074. Mr. East says:

"But it does not appear to have been decided that it is necessary to give express evidence of previous malice against the owner in order to bring a case within the act; but, the fact being proved to be done wilfully, which can only proceed from a brutal or malignant mind, it seems a question solely for the consideration of the jury to attribute the real motive to it, to which the transaction itself will most probably furnish a clue."

The question under this statute does not appear to have arisen before in this State. It has arisen upon two other statutes involving malicious injury to property. The statute (section 9275, 2 How. Stat.) provided:

"If two or more persons shall wilfully and maliciously combine or conspire together to obstruct or impede, by any act, or by means of intimidation, the regular operation and conduct of the business of any railroad company, or any other corporation, firm or individual in this State, or to impede, hinder, or obstruct, except by due process of law, the regular running of any locomotive engine, freight or passenger train, on any railroad, or the labor and business of any such corporation, firm, or individual, such person shall, on conviction thereof, be punished by imprisonment in the county jail for a period not more than

three months, or in the State prison for a period not exceeding two years."

In *People* v. *Petheram*, 64 Mich. 252, the defendant was arrested, charged with conspiring and combining with others to wilfully and maliciously obstruct and impede the regular operation and conduct of the business of a manufacturing company. It was there urged that the intent and malice must be aimed at the business obstructed. The court held, however, that the statute did not require malice to be shown toward the owner or his business or property, but that the malice required to be shown was the general malice of the law of crime, and that the acts shown may, as in other cases, furnish the presumption of malice. In a prosecution under section 11584, 3 Comp. Laws, for maliciously injuring a building, the same rule was followed, citing and approving *People* v. *Petheram*. *People* v. *Burkhardt*, 72 Mich. 172. The malice required under the statute now under consideration is not different from the malice required by the statutes in the above cases. To sustain the contention on behalf of the respondent in this case would be to overrule those two cases. They have stood unchallenged for many years, and we see no occasion now to overrule them. See, also, *State* v. *Boies*, supra, and *Brown* v. *State*, . supra.

In view of a new trial we may say that the court should instruct the jury that malice is an essential ingredient of the crime.

Conviction reversed, and new trial ordered.

BLAIR, C. J., and MONTGOMERY, OSTRANDER, and BROOKE, JJ., concurred.