# CHARLESTON

### STATE v. MICHAEL.

Submitted June 23, 1914.    Decided June 30, 1914.

1. HOMICIDE—*Instructions—Self-Defense.*

    An instruction, given at the instance of the State, in the trial of an indictment for murder, where the accused admits the homicide and seeks to justify it on the ground of self defense, which excludes from the consideration of the jury extenuating circumstances showing want of malice, and which, in effect, tells the jury that they should find the accused guilty of murder in the second degree, unless they believe he had cause to believe, and did believe, that it was necessary to kill deceased in order to save his own life or himself from great bodily harm, is prejudicial error and calls for the reversal of a judgment based on a verdict of second degree murder. (p. 618).

2. SAME—*Murder—Heat of Passion.*

    A person who has been struck, by some person unknown to him, a violent blow on the head with a stone weighing about a pound and a quarter, hurled at him while standing on the steps of a railroad train, just as the train is pulling out from the station where a num-

ber of people have gathered in the night time, and who immediately thereafter draws his pistol and fires at, and kills, one of two persons standing a little apart from the crowd, who he supposed was the person that threw the stone and who he believes is in the act of hurling another at him, is not guilty of murder. Killing under such circumstances is done in the heat of passion suddenly aroused by sufficient provocation and is without malice. (p. 619).

(ROBINSON, JUDGE, concurring only in result.)

Error to Circuit Court, Greenbrier County.

L. J. Michael was convicted of murder in the second degree, and brings error.

*Reversed and Remanded.*

. *S. C. Burdett* and *Henry Gilmer*, for plaintiff in error.

*A. A. Lilly*, Attorney General, *John B. Morrison* and *J. E. Brown*, Assistant Attorneys General, for the State.

WILLIAMS, JUDGE:

L. J. Michael was convicted of murder in the second degree and sentenced to confinement in the penitentiary for six years, and brings error. The principal errors assigned are the giving of instructions Nos. 1, 2, 4, and 5 on behalf of the State, and the refusal of the court to set aside the verdict and grant the defendant a new trial.

Defendant was convicted of murdering one John Miller on the night of January 15, 1913, at Eskdale, Kanawha county, by shooting him. He admitted the killing, and sought to justify it on the ground of self defense. Eskdale is a mining town on Cabin Creek in Kanawha county, within the territory embraced in the Governor's proclamation of martial law which was declared on or about the 5th day of November, 1912. At the time the killing occurred the state national guards had been withdrawn from the territory, but it appears that the Governor's proclamation was still in force. One of the chief causes of complaint by the striking miners against the operators was the maintenance by the latter of what were known as Baldwin-Felts Guards, or detectives, and after the withdrawal of the state troops certain members of the state national guards were employed by the operators in place of

the Baldwin-Felts guards to keep watch over their property. Among those thus selected and employed was the defendant who was a member of Company I of Fairmont, West Virginia. He claimed to be acting under Major J. B. Payne, a deputy sheriff of Kanawha county, who had charge of the guards on Cabin Creek. On the evening of the homicide Major Payne and defendant were on the Chesapeake & Ohio Railway train going up the branch line from Cabin Creek Junction. On the way up a colored man by the name of Dan Chain, otherwise known as "Few Clothes", was on the train returning from the penitentiary. He was in the ladies' coach, intoxicated and was using loud and boisterous language. Defendant asked him to leave the ladies' coach and go into the smoker, and he refused to do so, and defendant says he then took hold of him and removed him to the smoker. When the train arrived at a little station called Cane Fork, a half mile below Eskdale, there was some trouble with the engine which delayed the train for about half an hour. Before the train pulled out Dan Chain got off and walked on in advance of it toward Eskdale. When the train arrived at Eskdale it was dark, but the electric lights were shining. A large crowd of people, variously estimated from seventy-five to one hundred and fifty persons, had congregated at the little station. Defendant testifies that it was rumored that stones had been hurled through the windows of the coaches at this place; that on the night before a stone had been thrown into the coach and hit a man, whose name he did not know, and hurt him very badly. This fact is also testified to by Major Payne, and it is not denied. On account of these rumors and the Dan Chain incident which had just occurred, and supposing that he had reached Eskdale before the train arrived, defendant and Major Payne both say they were anticipating that the train might again be stoned, and when the train stopped they got off and walked along on the platform the length of a coach, between the train and the crowd that had congregated, thinking that their presence might prevent a recurrence of any violence. Defendant says that, as he stepped from the coach onto the platform, he heard someone remark: "There is the son-of-a-bitch with the

yellow leggins on;'' that he was the only one present who wore yellow leggins, and knew that the remark was intended to apply to him, though he says he did not know who made it. He further says that, as the train started to pull out from Eskdale Major Payne caught the railing at the rear end of the smoking car and got on the platform, and he caught the front end of the first day coach and got on the step and as he did so he turned his head to watch two persons whom he says he observed standing a little apart from the crowd and who looked to 'him suspicious. He says, quoting his testimony: ''as long as I faced them, they just looked at me; when I started to turn my head, I saw the motion of an arm. Q. From whom? A. From one of these two men; but it was too late to prevent myself being hit with a rock, which is used as. ballast, and which weighed a pound and a quarter or· about a pound and a quarter, and was stunned very badly, and when I looked around I saw this colored fellow, whose name I did not know at that time, in this position. (Witness shows jury) I pulled a gun from my overcoat pocket and braced myself to quick aim and shot him. Q. What position was he in? A. In this position. (Witness shows jury)· I didn't see him after he was shot, but, as I am informed, the bullet entered on this side, above this eye, and came out back here. Q. What did you suppose he was about to do? A. I supposed he was about to throw again and I knew I was not in a position to escape it. Q. Had you been hit at that time? A. I had been hit and was bleeding; in fact, the blood was coming down over my face. Q. What was the effect of the blow? A. The effect of the blow knocked me, and some one, I think it was the brakeman, caught me and had his hand on me while I fired the shot. Q. For what purpose did he catch you? A. To keep me from falling from the train. Q. State whether you were about to fall? A. I don't really believe I could have kept on the train alone; I became very weak in a few minutes; the wound bled quite a bit. Q. You say the rock thrown was used for ballast? A. In my opinion. Q. Where did you see the rock after you were hit? A. Mr. E. B. Rousse picked the rock from the platform of the train. Q. Did you see it fall?

A. I heard it fall but I didn't pick it up at the time. Q. Did you see the rock after it fell to the floor of the platform? A. No sir; I heard the rock fall, but I didn't look to see.''

The stone with which defendant was hit was identified and exhibited to the jury. It was a piece of slag, used as ballast on the railroad, nearly square, very sharp on the edges and weighed about a pound and a quarter. That defendant was hit on the head and badly hurt with the stone thrown by someone standing in, or near, the crowd, was clearly proven and not denied. The stone cut through a Derby hat and through the scalp to the skull. Dr. McMillion of Charleston, who dressed the wound that night, after the defendant was brought to Charleston, testifies that he ''found an incised wound penetrating the scalp and the lining of the skull, extending into the plate of the skull.'' He says he made a very careful examination and cleansed the wound of infectious matter and dressed and closed it up. As to the character of the wound there is some conflict of testimony. Dr. L. M. Campbell, a witness for the State, testifies that he examined it about a half hour after it was inflicted and regarded it as a slight wound. He says it was superficial and did not reach the skull. But it appears that his examination of it was likewise superficial. On cross-examination he stated that he regarded a serious wound, one that endangered life, and admitted that a man might get a very hard blow and not receive a wound that he regarded as serious. He admitted that if Dr. McMillion stated that he had made a careful examination of the wound and concluded that it did go to the skull, that he would have no reason to doubt his diagnosis. If he had made a careful diagnosis himself he would not likely have made such admission.

Defendant was asked why he fired the shot and answered as follows: ''I fired that shot because I was positive that I could not get out of the way of a stone coming at that rate that the other one had come and I felt my life was worth just as much as his and if I could I would rather take his than lose mine, under the circumstances. I felt that was what it would be.'' There is also conflict in the evidence as to whether deceased had his arm drawn, as if to throw a stone.

Witness D. W. Williams, mayor of Eskdale, says, when deceased was shot he fell on his back and had his hands in his front pockets  This witness arrested defendant on the train immediately after the shooting, the train having been stopped, and he further says, quoting his language: ''He (defendant) seemed to be in a rather stupor and seemed to be under the influence of whiskey.'' He found on the person of defendant a pint bottle half full of whiskey. But Dr. Campbell, another state witness, says, when asked whether defendant was sober or intoxicated, that so far as he could judge he was ''normal,'' by which we suppose he meant he was sober, it not appearing that defendant was in the habit of becoming intoxicated. Defendant himself states that he had not taken a drink, that a friend of his, Wilson, asked him at Cabin Creek Junction on the way up to take a drink with him and he declined, and thereupon he gave defendant the bottle and told him to take it with him.

We have thus briefly narrated the material facts and circumstances attending the commission of the homicide in order that it may be seen whether or not the instructions complained of are properly applicable thereto. The first instruction given for the State, and complained of, reads as follows: ''The Court instructs the jury that a man is presumed to intend that which he does, or which is the immediate or necessary consequence of his act, and if the jury believe from the evidence in this case that the defendant, L. J. Michael, with a deadly weapon in his possession shot and killed one John Miller as alleged in the indictment in this case, then the said L. J. Michael, is presumed to be guilty of murder in the second degree and you should so find unless you further believe from the evidence that at the time the defendant shot and killed the deceased he, the said L. J. Michael, had reasonable ground to believe, and did believe, that he was in danger of his life or great bodily harm, at the hands of the deceased and that he shot the said John Miller to save his own life or to protect himself from great bodily harm at the hands of the said John Miller, or that he shot the said John Miller in an effort to shoot some person in close proximity to said Miller, whom he, the defendant, had reasonable ground to believe

and did believe was about to kill him or inflict great bodily harm upon him, and that such shot was fired to save his own life or to protect the same from great bodily harm then imminent.'' It is insisted that this instruction is erroneous, (1) because it does not inform the jury that the presumption of murder in the second degree may be rebutted by proof of extenuating circumstances; and (2) because it told the jury, in effect, that if they did not believe defendant had made out a case of self defense they could not find him guilty of any lower grade of homicide than murder, and were bound to find him guilty of murder in the second degree. The objection to the instruction is well taken. It does in fact deprive defendant of the benefit of all extenuating facts and circumstances attending the homicide which tended to reduce it to a lower degree of crime than a murder. The jury may not have believed that the killing was justified, they may not have thought the facts warranted defendant in killing deceased in order to preserve his own life or save himself from great bodily harm. Yet he may not have been justified, and still not guilty of murder, if extenuating circumstances exist. Defendant had just received a violent blow on the head from a stone thrown by some unknown person. Was this not sufficient provocation to arouse his passion and incite him to sudden action? If such an assault did not amount to great provocation it is difficult to imagine what kind of an assault would be sufficient. If a man kills another in the heat of passion, suddenly aroused, upon great provocation, before he has time to deliberate, he may be guilty of manslaughter, but he is not guilty of murder, because the crime lacks malice which is an indispensable element of murder. That defendant shot and killed deceased intentionally is admitted. The act was therefore willful, and it may have been unlawful, but there is no evidence of malice. Malice is usually inferred from the act of killing by the use of a deadly weapon, but the act must be viewed in the light of all the attending facts and circumstances. Speaking of homicide committed in the heat of passion, Wharton says, ''the law, kindly appreciating the infirmities of human nature, extenuates the offense committed, and mercifully hesitates to put on the same footing of

guilt, the cool, deliberate act and the result of hasty passion.'' Wharton on Homicide, Sec. 5. It was the duty of the jury to follow the instructions of the court, *State* v. *Dickey,* 48 W. Va. 325, and doing so in this case, they were bound either to find defendant guilty of murder in the second degree, or acquit him. They could not have found him guilty of voluntary manslaughter without violating the instruction. Notwithstanding justification was the only defense relied on, defendant was, nevertheless, entitled to the benefit of any facts and circumstances proven in the case, either by the state or by his own witnesses, which tended to reduce the crime below murder. Manslaughter usually grows out of personal quarrels and combats, but it is not confined to such cases. Any unlawful and intentional killing, even by the use of a deadly weapon, when the passion of the slayer is suddenly aroused upon some great provocation, is voluntary manslaughter, and not murder. Killing under such conditions lacks malice. Malice is a well known legal term, but one not easy to define in the abstract. But, says Blackstone, 4 Commentaries, 198, it ''is the grand criterion which now distinguishes murder from other killing.'' Judge Lomax says in his opinion in *McWhirt's Case,* 3 Grat., at page 605 : ''The difference between the crimes of murder and manslaughter, consists in this, that manslaughter, (where voluntary,) arises from the sudden heat of the passions, murder from the wickedness of the heart.'' This court said, in *State* v. *Douglass,* 28 W. Va. 297, malice shows a ''heart regardless of social duty and fatally bent on mischief. Every unjustifiable and unlawful killing is not necessarily murder. If one kill another in resisting an unlawful arrest, even though he may not apprehend any great bodily harm, he is not guilty of murder, but manslaughter.

''In a prosecution for a murder, where the evidence was directly conflicting as to the provocation of defendant and the manner in which deceased was killed by him, it was reversible error to confine the jury to a verdict as to murder.'' *Johnson* v. *State,* (Miss.) 23 Sou. 579. And in a later case, *May* v. *State,* 42 Sou. 164, the same court held that: ''Where, in a prosecution for homicide, the evidence did not warrant

a conviction for a higher offense than manslaughter, it was error to omit to charge on manslaughter, though no such instruction was requested." See also *Bonner* v. *State,* (Texas), 15 S. W. 821. "An instruction that if defendant unlawfully shot deceased with a deadly weapon as alleged, and thereby killed him, as charged in the indictment, the jury should find him guilty of murder in the second degree, was objectionable for failure to require that the killing must be on malice or implied malice aforethought." *Clark* v. *State,* (Texas), 102 S. W. 1136. In *Mize* v. *State,* 69 S. E. 173, the supreme court of Georgia held in a case of homicide where the facts and circumstances attending the killing were such as to warrant a finding of voluntary manslaughter, that it was error in the court not to charge the jury upon the law of voluntary manslaughter. In *State* v. *Taylor,* 57 W. Va. 228, this court held that an instruction which was so framed as to exclude a verdict of manslaughter, where there were circumstances tending to show that the crime was committed in hot blood, was erroneous. It also held in *State* v. *Clifford,* 59 W. Va. 1, that malice is a question to be determined by the jury upon the evidence, but that the court should determine whether or not any evidence existed to sustain the jury's finding. The court may determine this question either in passing upon instructions or upon a motion to set aside the verdict. See also *State* v. *Hertzog,* 55 W. Va. 74.

It is argued that the court properly instructed the jury on the various degrees of homicide, at the request of defendant. But this does not cure the error in the State's instruction, which is in effect binding. A bad instruction is not cured by a good one and will be presumed to have prejudiced the party complaining. *McKelvy* v. *C. & O. Ry. Co.,* 35 W. Va. 500; *Parkersburg Industrial Co.* v. *Schultz,* 43 W. Va. 470, and cases cited in opinion of Judge BRANNON at page 482.

The State's instruction No. 2 is also complained of. It reads as follows: "The Court instructs the jury that the defendant cannot rely by way of justifiable self defense on any acts done or threatening motions made by a person other than John Miller, unless the defendant has further shown by the evidence to the satisfaction of the jury that he fired at

such other person and not at John Miller.'' This instruction does not submit to the consideration of the jury defendant's testimony tending to prove that deceased and the person standing near him were acting in concert. If defendant believed they were so acting, having been already hit with a stone, he would naturally have thought that both were armed with stones and ready to hurl them at him; and, while the jury may not have thought he was justified in shooting at either of them, he would not have been guilty of murder in killing either one of the two, but only guilty of manslaughter. If they were in fact acting in concert, and of this the jury had to be the judge, then the act of one was the act of both.

The State's instruction No. 4 correctly propounds the law. The burden was upon defendant to prove that the killing was in self defense. The instruction says he must prove it ''to the satisfaction of the jury.'' Although the terms usually employed in such instructions are, ''by a preponderance of the evidence,'' there is no substantial difference in the meaning of those terms, a preponderance of evidence would certainly satisfy, or ought to satisfy, the jury.

We do not perceive any prejudice to defendant in the giving of State's instruction No. 5, which told the jury that there was no evidence in the case to show that the defendant was a legally deputized officer of the law at the time of the killing. His own testimony tended to prove that he was acting under Major Payne, a deputy sheriff of Kanawha county; but whether defendant was or was not a deputized officer, it could not have affected the merits of the case.

For the reasons herein given for holding it error to give the State's instruction No. 1, it was also error to refuse to set aside the verdict and grant defendant a new trial. There is not sufficient evidence in the case from which the jury could infer malice. The judgment is reversed, the verdict set aside, and a new trial awarded.

ROBINSON, JUDGE, *(concurring only in the result):*

Because of the binding character of the first instruction for the State, on the limited purview of the case which it sets forth, it may have been prejudicial to the accused; and for

this reason alone I concur in the award of a new trial, but not in the second point of the syllabus and the opinion of the court wherein the same go further.  Particularly out of place, in my humble judgment, is the expression of opinion that the homicide was committed without malice.  Surely that is a matter which should be left to the determination of a jury.  On the conflicting facts and circumstances a jury should say whether there was heat of passion or other thing which would reduce the killing to manslaughter.

*Reversed and Remanded.*