516 S.E.2d 491

STATE of West Virginia, Plaintiff Below, Appellee,

v.

William H. BURGESS, Defendant Below, Appellant.

No. 25801.

Supreme Court of Appeals of West Virginia.

Submitted May 5, 1999.

Decided May 26, 1999.

Dissenting Opinion of Justice McGraw June 2, 1999.

Darrell V. McGraw, Esq., Attorney General, Barbara H. Allen, Esq., Managing Deputy Attorney General, Charleston, West Virginia, Attorneys for the Appellee.

Kennad L. Skeen, Esq., Skeen & Skeen, Ripley, West Virginia, Attorney for the Appellant.

MAYNARD, Justice:

On December 3, 1997, the defendant, William H. Burgess, was convicted by jury trial in the Circuit Court of Jackson County, West Virginia, of the malicious killing of an animal in violation of W.Va.Code § 61–3–27 (1994). The defendant was sentenced to one to ten years in the penitentiary. He appeals, contending the killing was not malicious. We agree.

In October 1996, Robert Henry owned seven head of cattle, including a seven-month-old Charolais–Hereford worth approximately $300. The cattle were pastured on Elmer McMurray's property. On October 11, 1996, Mr. Henry was working for and riding home with P.J. Pendley. During the ride home, Henry asked Pendley if the two could stop to check on the cattle. When they arrived at the McMurray pasture, they discovered the Hereford lying down. While checking the situation out, they discovered the calf was dead. It had been shot through the eye and had been field dressed. The two immediately left the calf to call the authorities and get a gun. They then returned to the pasture to await the possible return of the cow's killer.

Perhaps an hour later, just as the sun was setting, a truck came to a stop at the top of the hill. A person got out, and, using a flashlight, entered the pasture by crossing a gate and began walking toward the dead cow. That person was later identified as the defendant. The defendant was stopped by Henry and Pendley. He had blood on his pants and shirt and was carrying two knives on his person. One knife had blood on it. The defendant attempted to rid himself of that knife by throwing it on the ground before the West Virginia Department of Natural Re-

sources Law Enforcement Officer (DNR Officer) arrived on the scene. The knife was recovered about five feet from the place where the defendant was sitting on the ground.

When asked what he was doing on the property, the defendant replied he was going frog gigging. When asked where his gig was, he replied he was looking for the pond and after finding it, he would return home to get his gig. When asked who was in the truck, the defendant said that was his uncle, Cecil Burgess. When asked where his uncle was going, he replied to the Pit 'N Git to get a six-pack of beer. Cecil Burgess returned to the pasture and parked in the road to await the defendant's reappearance, but eventually left after being questioned by Henry as to what he was doing there.

The DNR Officer arrived and placed the defendant in protective custody. After inspecting the dead cow, he advised the defendant of his constitutional rights. After taking a statement from the defendant, the officer transported the defendant to the sheriff's office. The officer then assisted Deputy James Barr by taking swabs of blood from the defendant's hands and fingernails. At trial, the DNR Officer testified that the defendant's knife had blood on it and the defendant's clothes had blood on them. Deputy Barr testified that these were sent, along with the swabs, to the state police laboratory to be analyzed. Some blood from the animal was also sent for comparison purposes.

David Miller, forensic scientist for the West Virginia State Police Biochemistry Laboratory, testified at trial that the samples were tested for species of origin and the blood was indeed cow blood. Miller explained that the blood on the jeans was not transfer stains. That simply means the blood was not transferred from the ground to the jeans;

rather, the evidence showed the blood was sprayed or splattered onto the jeans. Miller also explained this case did not involve DNA analysis.

The defendant was indicted during the February 1997 term of court for "unlawfully, feloniously and maliciously kill[ing] and caus[ing] the death of an animal, to-wit: one (1) cow of the value of greater than One Hundred Dollars ($100.00), of the property of Robert Henry, in violation of West Virginia Code 61-3-27, against the peace and dignity of the State." A jury trial was held on December 2-3, 1997. The defendant was convicted of the malicious killing of an animal in violation of W.Va.Code § 61-3-27 (1994)[1] and was sentenced to a period of one to ten years in the penitentiary. It is from this order the defendant appeals.

On appeal, the defendant assigns several errors. He contends: (1) the State did not prove the killing of the cow was malicious; (2) that during closing arguments, the State misrepresented the law and/or the facts; and (3) the circuit court erred by denying his request for a continuance when he had not been provided a transcript of the grand jury proceedings.

According to the evidence adduced at trial, there is little doubt the defendant killed Henry's calf. In fact, at trial, Cecil Burgess testified his nephew told him on the evening of October 11, 1996 that he had killed a cow. In his brief to this Court, the defendant does not contend he did not kill the cow. Even though he does not admit he killed the cow, he admits the killing was unlawful. He argues instead that the evidence presented by the State at trial does not prove the cow was killed maliciously.

The evidence shows the cow was killed by one bullet to the eye and was then field dressed. We recognize that large farm ani-

---

1. W.Va.Code § 61-3-27 (1994) reads as follows:

If a person maliciously administers poison to, or exposes poison with the intent that it should be taken by, any horse, cow or other animal of another person, or if any person maliciously maims, kills, or causes the death of any horse, cow or other animal of another person, of the value of one hundred dollars or more, the person is guilty of a felony, and, upon conviction, shall

be imprisoned in the penitentiary not less than one year nor more than ten years; and, if the horse, cow or other animal is of less value than one hundred dollars, the person is guilty of a misdemeanor, and, upon conviction, shall be confined in jail not more than three months and fined not more than five hundred dollars: Provided, That this section shall not be construed to include dogs.

mals have been raised for their meat in West Virginia for many many years. These animals are almost always dispatched by a gunshot to the head or by slitting the animal's throat. Also, wild animals, such as deer, or domestic animals, such as cows or horses, often run or wander into the highway and are hit by vehicles. When law enforcement officers are called to the scene of such an accident, the humanely accepted method of dispatching the injured animal is a gunshot to the head. We cannot say these killings are malicious.

The defendant cannot be convicted under W.Va.Code § 61–3–27 unless malice is proven by satisfactory proof. *State v. Fletcher*, 106 W.Va. 601, 146 S.E. 628 (1929). The statute can be fairly paraphrased as follows: If a person maliciously kills any cow of another person, of the value of one hundred dollars or more, the person is guilty of a felony, and, upon conviction, shall be imprisoned in the penitentiary not less than one year nor more than ten years.

By anyone's standards, that is a serious sentence. The law's apparent extraordinary concern regarding the manner and method by which we slaughter livestock should not come as a surprise to the reader. Custom, culture and the law have spoken for thousands of years on these matters. In fact, the ancient Hebrews had strict laws regulating such slaughter which have survived into the present.

For example, animals must be swiftly killed with a single stroke of a thin, very sharp blade. If not, and the beast suffers, then the meat is not "kosher" and it cannot be eaten. It is also a violation of orthodox dietary rules to mix meat and dairy products. This prohibition against eating meat and dairy at the same meal is thought to have come from the ancient pagan practice of boiling baby goats alive in their own mother's milk and then eating them. The horror of this inhumane cruelty was so repugnant to the patriarchs that it was banned and the meat/dairy prohibition still exists today.

In the examples, Hebrew law forbade cruel treatment or unnecessary suffering of a dumb animal by dietary strictures. Today, we use the stricture of a penitentiary sentence to forbid the same cruelty. However, before the penitentiary sentence in this case can be invoked, malice must be proven.

This Court has heretofore recognized that "malice" is not easy to define. In *State v. Michael*, 74 W.Va. 613, 620, 82 S.E. 611, 613 (1914), this Court noted that "[m]alice is a well-known legal term, but one not easy to define in the abstract." This Court also recognized in *State v. Starkey*, 161 W.Va. 517, 524, 244 S.E.2d 219, 223 (1978), *overruled on other grounds*, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995), that "[t]he term malice has been frequently used, but not extensively defined, by this Court." We therefore begin with a definition from Black's Law Dictionary 956 (6th ed.1990), which defines malice as "[t]he intentional doing of a wrongful act without just cause or excuse, with an intent to inflict an injury or under circumstances that the law will imply an evil intent.... A condition of the mind showing a heart regardless of social duty and fatally bent on mischief." "Malicious" means "[c]haracterized by, or involving, malice; having, or done with, wicked, evil or mischievous intentions or motives; wrongful and done intentionally without just cause or excuse or as a result of ill will." Black's Law Dictionary 958 (6th ed.1990).

*Michael* and *Starkey* both refer to an old criminal case, *State v. Douglass*, 28 W.Va. 297, 299 (1886), where this Court discussed malice by stating:

> the source of ... malice is not only confined to a particular ill will to the deceased, but is intended to denote ... an action flowing from a wicked and corrupt motive, a thing done *malo animo*, where the fact has been attended with such circumstances as carry in them the plain indications of a heart regardless of social duty, and fatally bent on mischief. And therefore malice is implied from any deliberate cruel act[.]

"Perhaps the definition of malice most often quoted is that stated in *State v. Doig*, 2 Rich. 179, which is as follows: 'In law, malice is a term of art, importing wickedness and excluding a just cause or excuse.'" *State v. Harvey*, 220 S.C. 506, 514, 68 S.E.2d 409, 412 (1951), *overruled on other grounds*, *State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991).

Most definitions include one or more terms such as wicked, evil, depraved or cruel.

We can say the act committed in the case at bar was deliberate and with no just cause or excuse; however, we simply cannot say the act was evil and cruel. If the defendant had tortured the animal by repeatedly stabbing it until it died, or if the defendant had beat the animal with a stick or club until it died a slow, agonizing death, or if he had burned the cow to death or used any other inhumane method, that would show a wicked and depraved heart.[2] However, as we previously stated, the method used to kill the cow is the most humane, instantaneous, painless method known. It is the same method used throughout West Virginia by farmers and slaughterhouses every day. There simply is not sufficient evidence in this case from which a reasonable jury could find malice.[3] To decide otherwise would leave every farmer or stockyard owner who dispatches an animal for "another person" susceptible to being charged with the crime of maliciously killing an animal. We therefore hold that when one unlawfully dispatches a domestic animal belonging to another person by using a commonly accepted, humane method, and there is no evidence of any other form of malice, the killing is not malicious and consequently does not violate W.Va.Code § 61–3–27 (1994).[4]

This is a difficult case because a serious crime deserving serious punishment was committed when Henry's cow was shot and butchered. Unfortunately, there is a charging error in this case. The prosecuting attorney properly could have charged the defendant with larceny or trespass or both; however, he was indicted for neither of these crimes. This defendant was obviously trying to steal beef he intended to obtain by butchering the animal. His intent was theft. He had larceny in his heart, not malice. He was motivated by his stomach, not his heart. In this case, the State failed to prove the killing was malicious. Consequently, the conviction and sentence for the malicious killing of an animal belonging to another person is vacated and the case is remanded for entry of a judgment of acquittal. *See State v. Baker,* 177 W.Va. 769, 771, 356 S.E.2d 862, 864 (1987) ("In view of the fact that the defendant was entitled to a judgment of acquittal, no retrial is permitted and the case is remanded for the entry of such judgment.")

The conviction and sentence in this case is vacated and the case is remanded for entry of a judgment of acquittal. The defendant is ordered to be released.

Vacated and remanded.

McGRAW, Justice, dissenting:

(Filed June 2, 1999)

The most troubling aspect of this case is that it puts the farmers of this state in serious peril, since the criminal deterrent protecting their livestock has been gutted. Cash receipts related to livestock and dairy production in West Virginia totaled over $125 million in 1997, accounting for nearly one-third of all agricultural-commodity income. There are over 14,000 cattle operations alone. This valuable economic resource is now at risk to human predators, who can prey on thousands of hard-working West Virginia farmers with relative impunity. Today, we have the odd situation where it is a felony to intentionally destroy a farmer's crops, W. Va.Code § 61–3–34 (1994) (felony offense punishable by 1–to–10 years imprisonment to destroy crops with value greater than

---

**2.** We note here that there may be other ways whereby the humane killing of livestock might nevertheless be malicious. For example, proof that the defendant killed the animal for no other reason than just to watch it die; or proof that he did so out of spite or to extract vengeance against or to simply annoy the owner, would be other forms of proof of malice.

**3.** This Court enunciated the sufficiency of the evidence standard in *State v. Guthrie,* 194 W.Va.

657, 668, 461 S.E.2d 163, 174, (1995), by stating, "[T]he relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt."

**4.** Because we are reversing the trial court's verdict on this error, we find it is not necessary to reach the other errors assigned by the defendant.

$1,000), but no specific offense at all to "humanely" kill his or her animals! [1]

This unfortunate circumstance results from a misreading of W. Va.Code § 61–3–27, which is clearly intended to protect property, not to govern animal slaughter. Although perhaps not a proper indicator of legislative intent, *see* W. Va.Code § 2–2–12 (1965), it cannot escape notice that this statute is codified in an article dealing with crimes against property.[2] If there could be any doubt that § 61–3–27 was not intended as an anticruelty statute, it is erased by the manner in which the statute dispenses different punishments on the basis of the value of the animal. Obviously, the Legislature was not concerned about how these animals are killed or maimed, but rather with the economic damage suffered by the owners of such property.

Section 61–3–27 can be traced as far back as 1670, when Parliament under Charles II made it a capital offense to "in the nighttime maliciously, unlawfully, and willfully kill or destroy any horses, sheep, or other cattle, of any person or persons whatsoever." 22 & 23 Car. 2 ch. 7, § 2 (Eng.).[3] This Court is the first in over three hundred years to construe such a law to require proof of animal cruelty.

The many cases interpreting statutes similar to § 61–3–27 hold that malice in this context relates to the intended effect on the owner of the animal, not the animal itself. This is black-letter law:

> At common law and under the statutes in affirmation thereof, the malice, which is an essential ingredient in the offense of malicious mischief or injury to animals, must be against the owner of the animal and not against the animal itself, but ... actual ill[-]will or resentment towards the owner or possessor of the property need not be shown.... It need not be shown that the offender actually knew the owner but it will be sufficient to show that he was bent on mischief against the owner, who so ever he might be.

3A C.J.S. *Animals* § 319, at 839 (1973) (footnotes omitted).

American courts have largely accepted the construction given to the antecedent English statutes. *E.g., People v. Minney,* 155 Mich. 534, 119 N.W. 918, 921 (1909). In *King v. Pearce,* 1 Leach 527, 168 Eng. Rep. 365 (Crown 1789), the court concluded that "it was necessary to sh[o]w that the maiming of the animal was done from some malicious motive towards the owner of it, and not merely from an angry and passionate disposition towards the beast itself ...." These early English cases rejected any contention that the malice element required a showing of cruelty toward the animal. *See King v.*

1. The majority notes that in cases such as this the defendant can still be charged with larceny or trespass. The problem is that larceny requires proof of the asportation or carrying away of another's property. *See State v. William .T.,* 175 W.Va. 736, 338 S.E.2d 215 (1985) (*per curiam*); *State v. Nelson,* 121 W.Va. 310, 3 S.E.2d 530 (1939). Thus, while common law larceny might proscribe the conduct in this case (where the animal was slaughtered and carted away), it would not cover a killing unaccompanied by a theft of the animal carcass. W. Va.Code § 61–3–30 (1975), which makes it a misdemeanor offense for a person to "take and carry away, or destroy, injure or deface any property, real or personal, not his own," could conceivably impose some penalty in these situations; however, the deterrent effect is considerably less. The criminal trespass statute alluded to by the majority, W. Va.Code § 61–3B–3(a) & (b) (1978), suffers from a similar shortcoming.

Significantly, ours is not the only state to make it a felony to kill another's livestock. *See, e.g.,* Ariz.Rev.Stat. Ann. § 3–1307 (West 1995) (punishable by up to 2 years imprisonment); N.C. Gen. Stat. § 14–85 (1999) (punishable by up to 10 years imprisonment); Va.Code Ann. § 18.2–144 (Michie 1996) (punishable by maximum of 1–to–5 years imprisonment, and fine not exceeding $2,500).

2. Significantly, the Legislature has elsewhere made it a crime to cruelly mistreat an animal. W. Va.Code § 61–8–19(a) (1995) provides:

> (a) If any person cruelly mistreats, abandons or withholds proper sustenance, including food, water, shelter or medical treatment necessary to sustain normal health and fitness or to end suffering or abandons any animal to die, or uses, trains or possesses any domesticated animal for the purpose of seizing, detaining or maltreating any other domesticated animal, he or she is guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less than one hundred nor more than one thousand dollars, or confined in the county jail not more than six months, or both so fined and confined.

3. A subsequent enactment similarly made it a felony punishable by death to "unlawfully and maliciously kill, main or wound any cattle." 9 Geo. 1 ch. 22, § 1 (Eng. 1722).

**92**

*Shepherd,* 1 Leach 539, 168 Eng. Rep. 371, 372 (Crown 1790) ("[U]nless ... it was done from a malicious motive against the owner of the gelding, however savage and cruel his conduct might appear, [the defendant] could not legally be found guilty under this statute.").

The modern trend is even further away from the majority's position. For example, the Michigan Court of Appeals concluded in *People v. Iehl* that malice need not be specifically directed at either the animal or its owner; rather, the element was defined in the following broad terms:

> The element of malice in this statute requires only that the jury find that defendant 1) committed the act, 2) while knowing it to be wrong, 3) without just cause or excuse, and 4) did it intentionally or 5) with a conscious disregard of known risks to the property of another.

100 Mich.App. 277, 299 N.W.2d 46, 47–48 (1980) (citation omitted). This is all that should be required.

I have no trouble with the proposition that malicious intent *may* be inferred from acts of cruelty. What is perplexing, however, is how with respect to W. Va.Code § 61–3–27 the long-accepted definition of malice has been recast to *require* evidence of unusually cruel or inhumane conduct. In no other case have we defined malice, which is normally considered a mental element, *see* 1 Wayne R. LaFave & Austin W. Scott, SUBSTANTIVE CRIMINAL LAW § 3.4(a) (1986), to demand such heightened physical proof.

The definition ascribed here to the word "maliciously" will eventually compel consideration of whether other statutory offenses having malice as an element (of which there are many) require similar proof of aggravating circumstances. For example, what benchmark are we to use in interpreting W. Va.Code § 61–3–52 (1996), which makes it a felony to "willfully and maliciously" cut down or destroy the timber of another? Will the circuit courts now be compelled to instruct juries that our malicious assault statute, W. Va.Code § 61–2–9 (1978), requires conduct more brutal than the intentional infliction of a simple bullet or knife wound? While the answer to the latter question is obviously no,

this decision is bound to engender confusion in the future.

Thus, for the reasons stated, I respectfully dissent.