COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Huff, Judges Petty and Alston
Argued at Chesapeake, Virginia

NICHOLAS DAVID PELLONI

OPINION BY
v.        Record No. 0586-15-1        CHIEF JUDGE GLEN A. HUFF
FEBRUARY 2, 2016

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
William S. Moore, Jr., Judge

W. McMillan Powers, Assistant Public Defender, for appellant.

Robert H. Anderson, III, Senior Assistant Attorney General (Mark
R. Herring, Attorney General, on brief), for appellee.

Nicholas David Pelloni ("appellant") appeals his conviction of felony cruelty to animals,

in violation of Code § 3.2-6570(F).  Following a bench trial in the Circuit Court of the City of

Portsmouth ("trial court"), appellant was sentenced to twelve months in jail.  On appeal,

appellant asserts that the trial court erred in denying his motion to strike and renewed motion to

strike because "the evidence was insufficient in that it failed to prove beyond a reasonable doubt

that [appellant] did willfully inflict inhumane injury or pain on the companion animal Hannibal."

For the following reasons, this Court affirms appellant's conviction.

I.  BACKGROUND

On appeal, "we consider the evidence and all reasonable inferences flowing from that

evidence in the light most favorable to the Commonwealth, the prevailing party at trial."

Williams v. Commonwealth, 49 Va. App. 439, 442, 642 S.E.2d 295, 296 (2007) (en banc)

(quoting Jackson v. Commonwealth, 267 Va. 666, 672, 594 S.E.2d 595, 598 (2004)).  So viewed,

the evidence is as follows.

On July 31, 2014, Deputy Animal Control Officer Heather Harrison ("Harrison") arrived at the home of Jennifer Mason ("Mason") in response to a call "stating that there were several puppies in custody at this location that should be turned in." There is no evidence as to who made the call although Mason testified that it was not her. When Harrison arrived, Mason informed her that there were puppies located in her garage where appellant, the owner of the puppies, was living at the time. Mason also testified that it had never been her responsibility to care for the dogs and the only way she knew they were there was because she occasionally saw them in passing.

As soon as Mason opened the garage door, Harrison saw several boxer puppies and an adult female boxer, who appeared to be the mother, that "all looked very underweight." Harrison testified that upon the door being opened, she observed "a very, very strong odor coming from the garage of feces and just a strong, nasty odor." The dogs all appeared to be "very, very emaciated, ribs showing, hip bones showing," and there was bloody stool and feces in the crates and kennels where the dogs were being kept. Further, Harrison testified that there were no food or water bowls inside the crate that held six puppies, nor was there food or water found in the vicinity of the garage. The only water bowl in the garage was found in a wire crate that held the mother and the "water" inside that bowl was yellow.

On top of the crate was a green storage container that contained a deceased puppy named Hannibal. The storage container was lined with a dirty cloth. As with the other dogs, all of this puppy's ribs and hip bones were showing.

Appellant was not at home while animal control was present and after observing the conditions of each of the animals, Harrison seized all of the dogs. Harrison took the live animals to be treated by a veterinarian. The veterinarian testified that the puppies and the mother had bloody diarrhea, hookworms, roundworms, and were emaciated and dehydrated. Further, the

dogs had fleas and fecal matter on them. The veterinarian testified that most of the conditions these dogs suffered were "preventable with just good veterinary care and deworming and general medical care that most puppies get." The puppies should have already had their first veterinarian visit, based on their estimated age of eight weeks.

Hannibal also briefly was examined before being returned to the custody of animal control. Maggots were observed around his bedding and on his skin and he had black stool around him, both of which indicated severe medical problems. Hannibal was next taken to Dr. Carolynn Bissett ("Bissett") for a necropsy. After being qualified as an expert in animal cruelty, veterinary forensics, and animal abuse, Bissett testified to four contributing factors that caused the death of the puppy, the primary factor being severe starvation. Bissett determined that Hannibal was six to seven weeks old at the time of death and considering the negligible amount of feces in his colon and that his bone marrow fat, which should have been around 65-85%, was depleted to 6.88%, Bissett estimated that it took 2-3 weeks for Hannibal to starve to death. The other contributing factors were roundworms and hookworms found in Hannibal's fecal matter, either lung disease or pulmonary infection, and anemia. Bissett testified that starvation and intestinal parasites were preventable and that "[a]nyone could have seen this puppy and recognized that there was something abnormal."

On September 8, 2014, appellant signed surrender forms for all the dogs. Appellant admitted to Harrison that "he didn't bring the dogs to the vet" and that they had not had their shots. Appellant also admitted to Harrison that Hannibal had died the morning of July 31, 2014, and that he observed the puppy shaking just before he died. Appellant told Harrison that Hannibal had been sick for approximately one week but that he did not have the money to take the puppy to a veterinarian. Furthermore, appellant told Harrison that despite the evidence of

Hannibal's dehydration and starvation, appellant had been giving the puppy water and food before he died.

At the close of the Commonwealth's case, appellant moved to strike the evidence on the ground that it failed to prove that appellant acted willfully. The trial court overruled this motion, finding that "if you withhold food from an animal, it could be some form of torture and certainly willful if you don't care for it and feed it." Appellant did not put on any evidence and renewed his motion. The renewed motion was also overruled, and the trial court found appellant guilty, reasoning that "providing food is a basic need for an animal to survive." This appeal followed.

## II. STANDARD OF REVIEW

> In passing upon the sufficiency of the evidence, we are guided
> by certain well-established principles. Since the fact finder had the
> opportunity of hearing and observing the witnesses, its findings are
> entitled to great weight. . . . In addition, the verdict of the trial
> court will not be disturbed unless it appears to be plainly wrong or
> without evidence to support it.

Carter v. Commonwealth, 223 Va. 528, 532, 290 S.E.2d 865, 867 (1982). To the extent evidentiary issues present questions of statutory interpretation, such interpretations are questions of law that we review *de novo*. Woodard v. Commonwealth, 287 Va. 276, 280, 754 S.E.2d 309, 311 (2014); Abney v. Commonwealth, 51 Va. App. 337, 345, 657 S.E.2d 796, 800 (2008).

## III. ANALYSIS

On appeal, in both assignments of error, appellant contends that the trial court erred in overruling his motions to strike because the evidence was insufficient to find that he "intended Hannibal suffer pain," which he argues is required under Code § 3.2-6570(F).

Code § 3.2-6570(F) provides, in pertinent part, that

> [a]ny person who: (i) tortures, *willfully inflicts inhumane injury or*
> *pain* not connected with bona fide scientific or medical
> experimentation, . . . [on] any dog or cat that is a companion
> animal whether belonging to him or another; and (ii) as a direct

> result causes the death of such dog or cat . . . is guilty of a Class 6
> felony.

(Emphasis added). The term "companion animal" is defined under this chapter as "any domestic or feral dog . . . or any animal under the care, custody, or ownership of a person." Code § 3.2-6500.

The phrase "willfully inflict" has not been defined within the Code of Virginia nor is there any case law defining this phrase in the context of Code § 3.2-6570.[1] "Under basic rules of statutory construction, we determine the General Assembly's intent from the words contained in the statute. When the language of a statute is plain and unambiguous, courts are bound by the plain meaning of that language." Washington v. Commonwealth, 46 Va. App. 276, 296, 616 S.E.2d 774, 784 (2005) (*en banc*) (quoting Volkswagen of America v. Smit, 266 Va. 444, 452, 587 S.E.2d 526, 531 (2003)). "We must determine the General Assembly's intent from the words appearing in the statute, unless a literal construction of the statute would yield an absurd result." Schwartz v. Commonwealth, 45 Va. App. 407, 450, 611 S.E.2d 631, 653 (2005) (quoting Cummings v. Fulghum, 261 Va. 73, 77, 540 S.E.2d 494, 496 (2001)).

"Willful" is defined as "voluntary and intentional but not necessarily malicious." Willful, Black's Law Dictionary (10th ed. 2014). "A voluntary act becomes willful, in law, only when it involves conscious wrong *or* evil purpose on the part of the actor, *or* at least inexcusable

---

[1] In the only other statute to use the phrase "willfully inflict," Code § 18.2-55 proscribes the "knowing[] and willful[] inflict[ion of] bodily injury" on another person by a prison inmate. Code § 18.2-55(A). In Seegars v. Commonwealth, 18 Va. App. 641, 644, 445 S.E.2d 720, 722 (1994) (emphasis added), this Court interpreted the phrase "*knowingly and* willfully inflict" in the context of Code § 18.2-55 to mean the accused must have specifically intended to cause the proscribed result, i.e. "bodily injury." That analysis, however, is not controlling because Code § 3.2-6570 does not include the term "knowing." See Oraee v. Breeding, 270 Va. 488, 503, 621 S.E.2d 48, 55 (2005) ("[W]e presume that the legislature chose, with care, the words it used when it enacted the statute. Courts cannot add language to the statute the General Assembly has not seen fit to include." (citation and internal quotation marks omitted)).

carelessness, whether the act is right or wrong." Id. (emphasis added). Furthermore, "willfulness" is defined as "[t]he voluntary, intentional violation *or* disregard of a known legal duty." Willfulness, Black's Law Dictionary, supra (emphasis added).

In accordance with these definitions, the Supreme Court has held that "[t]he term 'willful act' [or omission] imports *knowledge and consciousness that injury will result* from the act [or omission] done. The act [or omission] done must be intended *or* it must involve a reckless disregard for the rights of another and will probably result in an injury." Barrett v. Commonwealth, 268 Va. 170, 183, 597 S.E.2d 104, 111 (2004) (emphasis added) (citing Code § 18.2-371.1(B)(1),[2] which proscribes the "willful act or omission" of failing to provide necessary care for a child).[3] In so holding, the Court reasoned that

> [t]he word [willful] often denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental. But when used in a criminal statute it generally means an act done with a bad purpose; without justifiable excuse; stubbornly, obstinately, perversely[.] The word is also employed to characterize a thing done without ground for believing it is lawful.

Id. (second and third alterations in original) (quoting United States v. Murdock, 290 U.S. 389, 394 (1933)). "The terms 'bad purpose' or 'without justifiable excuse,' while facially unspecific, necessarily imply knowledge that particular conduct will likely result in injury or illegality." Ellis v. Commonwealth, 29 Va. App. 548, 554, 513 S.E.2d 453, 456 (1999) (citing Murdock,

---

[2] Code § 18.2-371.1(B)(1) provides: "Any parent, guardian, or other person responsible for the care of a child under the age of 18 whose *willful act or omission* in the care of such child was so gross, wanton, and culpable as to show a reckless disregard for human life is guilty of a Class 6 felony." (Emphasis added).

[3] When a particular section of the Code does not define certain terms within that section, "[u]nder settled legal principles, . . . 'the Code of Virginia constitutes a single body of law, and other sections can be looked to where the same phraseology is employed.'" Hart v. Commonwealth, 18 Va. App. 77, 79, 441 S.E.2d 706, 707 (1994) (quoting King v. Commonwealth, 2 Va. App. 708, 710, 347 S.E.2d 530, 531 (1986)).

290 U.S. at 395-96). "Thus, the issue of the accused's mental state requires 'an examination not only of the act that created the risk, but also of the degree to which the accused was [or should have been] aware of the danger that resulted from the act.'" Shanklin v. Commonwealth, 53 Va. App. 683, 688, 674 S.E.2d 577, 580 (2009) (quoting Bean-Brewer v. Commonwealth, 49 Va. App. 3, 11, 635 S.E.2d 680, 684 (2006)).

"[The] correct application [of willfully] in a particular case will generally depend upon the character of the act involved and the attending circumstances." Lambert v. Commonwealth, 6 Va. App. 360, 363, 367 S.E.2d 745, 746 (1988) (alterations in original) (quoting Lynch v. Commonwealth, 131 Va. 762, 766, 109 S.E. 427, 428 (1921)).

> When a criminal offense is defined by a willful failure to perform a certain act, it is not sufficient to support a conviction merely to establish that the accused did not do a certain act without establishing circumstances that warrant an inference that the failure to do the act was intentional or by design.

Id. at 363, 367 S.E.2d at 747.

Therefore, in Ellis, this Court found that the evidence was insufficient to establish that the appellant's actions were willful and, consequently, in violation of Code § 18.2-371.1 (Child neglect). 29 Va. App. at 556, 513 S.E.2d at 457. In that case, the appellant left her apartment, with her daughters still sleeping in her bedroom, to visit a neighbor when the gas stove, inadvertently left on, caught fire. Id. at 553, 513 S.E.2d at 455. While appellant did intentionally and voluntarily leave her two children inside the apartment, the evidence was not sufficient to find that the appellant "left the apartment with the intent to injure her children; nor [did] the evidence support the conclusion that [the appellant] acted with knowledge or consciousness that her children would be injured as a likely result of her departure." Id. at 555, 513 S.E.2d at 457. In so concluding, this Court reasoned that the appellant's inadvertence in

forgetting to turn off the gas stove and her inattention to her children, "while clearly misguided, is reflective of simple negligence, not criminal conduct." Id. at 556, 513 S.E.2d at 457.

Likewise, in Lambert, this Court reasoned that "the mere failure to notify the police or to call does not establish that the failures [of the appellant] were willful" and thus a violation of Code § 53.1-37(D) (Prisoner furlough).[4] 6 Va. App. at 363, 367 S.E.2d at 747. Although the appellant was under an "affirmative duty to return or to notify the local police" in the event of an emergency, this Court stated "those unexplained omissions [of his failure to call or to report] by themselves are not sufficient to establish willfulness *to the exclusion of another equally reasonable explanation.*" Id. at 363, 364, 367 S.E.2d at 747, 747 (emphasis added). Notably, this Court made it clear that in proving willfulness beyond a reasonable doubt, the Commonwealth was not required to introduce evidence explaining the reason for the defendant's act or omission. Id. Nevertheless, this Court found the evidence was insufficient because the Commonwealth only produced evidence of the appellant's absence and failure to report without also introducing evidence of the circumstances surrounding his failure to return or report. Id. This Court reasoned that evidence such as how long the appellant was absent, whether the appellant returned of his own volition or was forcibly returned, the date of his eventual return, an accounting of his conduct while he was absent, should have been made "available to the factfinder to permit whatever inference might be drawn," including an inference that the appellant's failure was willful. Id. at 364, 367 S.E.2d at 747.

By contrast, in Barrett, the Supreme Court affirmed the trial court's ruling that the appellant acted willfully in the neglect of her two-year-old daughter and her ten-month-old son,

---

[4] Code § 53.1-37(D) makes it a felony to "willfully fail[] to remain within the limits of confinement set by the Director hereunder, or . . . willfully fail[] to return within the time prescribed to the place designated by the Director in granting such extension."

which resulted in his death, in violation of Code § 18.2-371.1. 268 Va. at 186, 597 S.E.2d at 112. The Court found that the appellant's act of falling asleep that morning as a result of her conduct the previous night, which included severe intoxication, coupled with her awareness of her daughter's propensity to injure her son amounted to more than "ordinary negligence." Id. at 184, 597 S.E.2d at 111. Specifically, the Court held that these circumstances satisfied the "willful act or omission" requirement of Code § 18.2-371.1 because the appellant "created a situation 'reasonably calculated to produce injury, or which [made] it not improbable that injury [would] be occasioned, and [she knew], or [was] charged with the knowledge of, the probable results of [her] acts.'" Id. (alterations in original) (quoting Cable v. Commonwealth, 243 Va. 236, 240, 415 S.E.2d 218, 220 (1992)). The Court reasoned that a jury could have reasonably concluded that the appellant's conduct was "willful and accompanied by acts of omission of a wanton nature" considering the following: the appellant knew her daughter's favorite place to play was in the bathtub and that she could turn on the water; the appellant knew her daughter was jealous of her son and had tried to kill him in the past; the appellant had seen her daughter pull her son into the tub head first before; the appellant admitted that she had drunk enough the evening before the incident to justify an arrest for driving under the influence had she been stopped on her way home the next morning; the appellant sent her daughter to her room well before nap time while she fell asleep on the couch knowing that she was the only person left in the apartment to supervise the children. Id. at 184-85, 597 S.E.2d at 111-12. The Court reasoned that all these facts were sufficient to prove, beyond a reasonable doubt, "that [the appellant] could reasonably foresee that her daughter would somehow cause the death of her son in a tub holding about two inches of water" and that she therefore acted willfully in neglecting her duty to protect her children. Id. at 184, 597 S.E.2d at 111.

Similarly, in this case, the evidence is sufficient to find that appellant's conduct constituted a "willful[] inflict[ion of] inhumane injury or pain" as proscribed by Code § 3.2-6570(F).  The evidence supports a finding that appellant voluntarily acted with a consciousness that "inhumane injury or pain" would result under the following facts: (1) appellant was the sole caregiver for the animals; (2) appellant was living in the same vicinity of the animals and would have easily noticed their debilitating conditions; (3) Hannibal starved to death over the course of 2-3 weeks, an easily prevented condition; (4) Hannibal was infected with parasites that had been in his system for at least two weeks by the time animal control found him; (5) there were no food or water bowls available to any of the puppies; (6) appellant admitted that he was responsible for providing food and water for Hannibal; (7) appellant admitted to Harrison that he intentionally did not take the dogs to see a veterinarian because of cost; (8) appellant knew Hannibal had been sick for at least a week but didn't take him for treatment because he didn't think he could afford it; (9) he admitted to watching Hannibal die, but did not take him for treatment; (10) most of these conditions were preventable with food, water, and "general medical care that most puppies get."

Unlike Ellis, where the mother forgot to turn off her stove in the apartment when she left, this case presents evidence sufficient to find that appellant acted consciously and intentionally over the course of several weeks in declining to provide food or water or basic veterinary services to Hannibal with an awareness of the likelihood that such failures would result in "inhumane injury or pain" leading to death. While he may not have committed these omissions for the purpose of inflicting Hannibal with " pain or inhumane injury," appellant admitted he knew Hannibal had been sick for at least a week and watched the puppy shaking as he died the morning of July 31, 2014.  In light of his admission, appellant's refusal to provide basic veterinary care for Hannibal, demonstrates his intentionality and his awareness of the likely

- 10 -

result of his inaction.  At the very least, appellant "created a situation . . . which [made] it not improbable that injury [would] be occasioned, and [he knew], or [was] charged with the knowledge of, the probable results of [his] acts."  Barrett, 268 Va. at 184, 597 S.E.2d at 111.  Appellant's decision to allow these conditions to continue for several weeks could lead a reasonable factfinder to conclude that appellant "willfully inflict[ed] inhuman injury or pain" on Hannibal in violation of Code § 3.2-6570(F).  No other "equally reasonable explanation" was presented.  Lambert, 6 Va. App. at 364, 367 S.E.2d at 747.  Accordingly, the evidence was sufficient to support the conviction.

## IV.  CONCLUSION

For the foregoing reasons, this Court affirms the ruling of the trial court.

Affirmed.