COURT OF APPEALS OF VIRGINIA

Present:    Judges Beales, Decker and AtLee
Argued at Richmond, Virginia

UNPUBLISHED

JERELYN AYMARIE SUTTER

MEMORANDUM OPINION* BY
JUDGE RANDOLPH A. BEALES
SEPTEMBER 25, 2018

v.    Record No. 0977-17-2

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
Cheryl V. Higgins, Judge

Alicia M. Milligan, Assistant Public Defender, for appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


Following a jury trial, Jerelyn Sutter ("appellant") was convicted of misdemeanor animal

cruelty in violation of Code § 3.2-6570 and of the malicious killing of a pig that is livestock of

another, a felony in violation of Code § 18.2-144.[1]  On appeal, appellant raises six assignments

of error – the first four of which challenge the trial court's rulings on certain jury instructions.  In

assignments of error I, III, and IV, appellant argues that the trial court erred by refusing to issue

three separate jury instructions.  In assignment of error II, appellant argues that the trial court

erred by issuing a jury instruction that permitted the jury to infer malice from the use of a deadly

weapon.  In assignment of error V, appellant claims that the trial court erred in excluding certain

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Appellant, who was tried together with her fiancé and co-defendant, Lee Oakes
("Oakes"), was acquitted of larceny of a pig that is livestock.

testimony as hearsay.  Finally, in assignment of error VI, appellant argues that the evidence was insufficient to support appellant's convictions.[2]

## I. BACKGROUND

### A. Facts Underlying Appellant's Convictions

On July 3, 2016, Officer David Wallace and Officer Bianca Clark of the Albemarle County Police Department captured a pig that was running loose in a residential neighborhood. The officers brought the pig to the Charlottesville-Albemarle Society for the Prevention of

---

[2] Appellant's assignments of error state:

> I.  The trial court committed reversible error by refusing to give the jury instruction marked as Instruction No. B. which added to the definition of malice set forth in Instruction No. 10 the following sentence:  "Malice is intended to denote an action flowing from any wicked and corrupt motive, done with an evil mind and purpose and wrongful intention."

> II.  The trial court committed reversible error by giving jury instruction No. 11 which stated that the jury "may infer malice from the deliberate use of a deadly weapon unless, from all the evidence, you have a reasonable doubt as to whether malice existed."

> III.  The trial court committed reversible error by refusing to give the jury instruction marked as Instruction No. C1 which further defined what constitutes willful conduct.

> IV.  The trial court committed reversible error by refusing to give the jury instruction marked as Instruction No. D which defined when the treatment of an animal is cruel or willful.

> V.  The trial court committed reversible error in failing to allow testimony that Albemarle County police officers told Appellant Sutter that they didn't care what she did with the pig because those statements were not being offered to prove the truth of the matter asserted and therefore were not hearsay.

> VI.  The trial court committed reversible error when it found sufficient evidence to find Appellant guilty of malicious killing of the livestock of another and cruelty to animals because Appellant did not act with malice or willful cruelty.

Cruelty to Animals ("the SPCA" or the "shelter"), which, by agreement with the city and county, operates to "provide temporary shelter" for animals brought to the location. The shelter also serves as the animal pound for the surrounding area. On that date, appellant was employed as a veterinary assistant at the shelter. The officers told the shelter's staff to keep the pig until "the ACO [animal control officer] could figure out who it belonged to or figure out what [the police officers] were going to do to get it to a proper facility." The following day – July 4, 2016 – Animal Control Officer Larry Crickenberger drove to the shelter to inquire about the pig. When he arrived, he learned that appellant had taken the pig to her home. Based on this information, Crickenberger directed staff members to contact appellant and instruct her to return the pig immediately to the shelter. When appellant arrived with her fiancé, Lee Oakes, they told Crickenberger "that they had potentially given it [the pig] to a friend to take to a butcher." However, they did not tell Crickenberger that the pig was already dead or that they had killed the pig the day before right outside the SPCA.

Before he could resolve the matter with appellant and Oakes, Crickenberger had to leave the shelter to answer an unrelated animal control call. Subsequently, on his way back to the shelter, Crickenberger received a call from appellant's supervisor. The supervisor informed him that, according to appellant, the pig was already dead and at a butcher's shop in Verona, Virginia. When Crickenberger arrived back at the shelter, he spoke again with appellant and Oakes. Oakes "was adamant that the pig was feral and that he had the right to kill it. [Appellant] basically took no stance. She was very quiet about the situation." Neither appellant nor Oakes even then told Crickenberger that they had already killed the pig. It was not until Crickenberger

reviewed the shelter's security videos that he learned that appellant and Oakes had killed the pig at the shelter on July 3, 2016 – the same day the pig was brought there.[3]

Autumn Earhart, who was a veterinary assistant at the shelter on July 3, 2016, testified that appellant told the staff that she was taking the pig home with her and that it would live in her dog run. According to Earhart, Officers Wallace and Clark "basically stated that once it was out of their hands, it was the SPCA's." After the shelter closed for the day, appellant and Oakes tried to hogtie the pig. Earhart testified that she retrieved a sheet – at Oakes's request – and placed it over the pig to calm it down. When the pig bit through Oakes's boot, Oakes asked appellant to get his hunting knife from the car. Earhart testified that appellant then retrieved Oakes's knife from his car, and appellant held the pig while Oakes stabbed it. At this point, Earhart backed away from the scene. She testified that, as she was leaving, the pig was "making a weird squealing gurgling sound."

Crickenberger examined the pig's carcass at the shelter on July 5, 2016. He testified that he observed "multiple stab wounds" in the area of the pig's neck. Crickenberger also observed a substantial wound, which he described as "a very large gaping wound, like an attempt to decapitate the pig." He also stated that "several [dog] leashes" had been used to hogtie the pig's back legs.

Dr. Kristen Scheller, Director of Veterinary Services at the SPCA, inspected the carcass and testified that the pig sustained "[m]ultiple stab wounds to the neck, to the sides of the neck and to the back of the neck." Dr. Scheller recalled that she "stopped counting at around fifteen [stab wounds]." In addition, Dr. Jaime Weisman, an expert in veterinary pathology and forensics, also examined the pig's carcass. When describing the stab wounds for the jury, she

---

[3] The Commonwealth entered the shelter's security footage into evidence and played it for the jury.

said that one wound – about five inches long, one and a half inches wide, and approximately three and a half inches deep – caused irregular tearing of the muscles due to a "cutting action." Dr. Weisman testified that, in her opinion, the stabbings must have occurred while the pig was still living – and that the pig had suffered. When asked if the manner used to kill the pig was considered "a typical slaughter technique," she responded, "No. I never would have guessed that that was the purpose." Dr. Weisman counted "a minimum of thirty-one (31) distinct stab wounds" on the pig. When asked how long she would estimate that it took for the pig to die, she stated, "[m]inutes. If I had to guess, somewhere around ten minutes . . . ."

Appellant testified in her own defense. She testified that she and Oakes planned to slaughter the pig the next day to eat at a neighborhood party. While the pig was at the shelter, appellant tried to walk the pig on a dog leash, but it attempted to escape and actually pulled her into the bushes. Appellant testified that, later in the day, Oakes also tried to walk the pig outside on a leash. When the pig likewise dragged Oakes into the bushes, appellant testified that Oakes "grabbed the pig or tackled it to keep it from running." While they held the pig down in an attempt to bind its feet, the pig bit through Oakes's boot. Appellant testified that Oakes asked her to get his hunting knife from the car, and she "felt at that point that [they] had no other option for the safety of the pig and the safety of the public . . . but to slaughter the pig there."

Appellant admitted that she held the pig as it thrashed, kicked, and tossed its head in an attempt to get away, while Oakes stabbed and sliced in an apparent attempt to sever the arteries in the pig's neck. She testified, "When he felt like he couldn't get in deep enough . . . he tried to cut [the pig's] spinal cord from the back." She said that she "was sorry that it had to happen that way" and that she did not want the pig to suffer. On cross-examination, appellant admitted that she believed that the pig did suffer.

After the pig was dead, appellant testified that she changed her pants, and placed the bloody ones in the shelter's washing machine. She also disposed of the bloody sheet, and Oakes "clean[ed] up" the ground outside the SPCA. According to appellant, she and Oakes then drove the pig's body to a meat processor.

## B. Hearsay Ruling

Appellant testified that she told the police officers who dropped off the pig that the shelter did not accept pigs and that the shelter had no place to keep it. She also attempted to testify about statements that the officers made to her, but the Commonwealth objected on the grounds of hearsay. The judge sustained this objection, and appellant's testimony was not admitted. Subsequently, outside the presence of the jury, the trial judge permitted appellant to proffer for the purposes of appeal what the officers told her. She testified, "[T]hey told me that they didn't care what I did with it [the pig] and it was no longer their problem." She also said that, when she told the officers that she and Oakes might take the pig,[4] "they said that they didn't care what I did with it." She stated, "I understood that to mean that it was not to stay at the SPCA, that it was being given to me personally and not being in the care of the SPCA." She did not recall whether the officers said that animal control would contact the shelter later about the pig.

## C. Jury Instructions

Appellant submitted several jury instructions, including proposed Jury Instructions B, C1, and D for the trial court's consideration, and the trial court refused to issue any of these three instructions to the jury. Appellant also challenged the court's issuing Jury Instruction 11.

---

[4] Appellant's proffered testimony did not include any testimony about whether she told the officers that she and Oakes might take the pig in order to have it slaughtered or if they intended to care for it temporarily because the shelter could not house it.

Appellant's proposed Jury Instruction B suggested the addition of the following italicized language to the Commonwealth's Instruction 10, which defined the element of malice under Code § 18.2-144:

> Malice is that state of mind which results in the intentional doing of a wrongful act without legal excuse or justification, at a time when the mind of the actor is under the control of reason. Malice may result from any unlawful or unjustifiable motive including anger, hatred or revenge. Malice may be inferred from any deliberate willful and cruel act, however sudden. *Malice is intended to denote an action flowing from any wicked and corrupt motive, done with an evil mind and purpose and wrongful intention.*

In denying appellant's requested Jury Instruction B, the trial judge stated, "I think it's somewhat confusing and I think the language could cause the jurors to think that there is some kind of additional burden by the use of the language 'action flowing from any wicked and corrupt motive, done with an evil mind.'" The trial judge then stated that she would issue the Commonwealth's Instruction 10 without the additional language in Instruction B.

Appellant likewise objected to the Commonwealth's Instruction 11, which stated, in relevant part, "You may infer malice from the deliberate use of a deadly weapon unless, from all the evidence, you have a reasonable doubt as to whether malice existed." Appellant argued that deadly weapons are always used to slaughter animals, and, therefore, Instruction 11 "could encourage the jury" to convict appellant simply because a knife was used to kill the pig. Instruction 11 was issued over this objection.

The trial court also refused to issue appellant's requested Jury Instructions C1 and D, which proposed definitions for the terms "willful" and "cruel" under the animal cruelty statute. Instruction C1, which was derived from this Court's opinion in Pelloni v. Commonwealth, 65 Va. App. 733, 743-44, 781 S.E.2d 368, 373 (2016), stated:

> Willful is defined as voluntary and intentional but not necessarily malicious. A voluntary act becomes willful, in law, only when it

involves conscious wrong or evil purpose on the part of the actor, or at least inexcusable carelessness, whether the act is right or wrong.  Furthermore, willfulness is defined as the voluntary, intentional violation or disregard of a known legal duty.

Appellant's requested Jury Instruction D stated, "Treatment of an animal is cruel or willful where one intentionally, knowingly, without justifiable cause, and with a malevolent purpose, voluntarily commits acts which unnecessarily inflict pain and suffering upon the animal." Appellant argued that both instructions were necessary to assist the jurors in determining whether appellant's conduct rose to the level of being willful and cruel.  However, the trial court did not issue these instructions, choosing instead to issue Instruction 15, which substantially mirrored the language of Code § 3.2-6570(A).  In denying Instruction C1, the trial judge stated, "While I do find that the Court[, in Pelloni,] was giving a reason for how it was doing its analysis, I don't find that that means that it's appropriate to give it as an instruction . . . ."  The trial court then went on to rely upon the "plain and unambiguous language" of the statute.  In denying the requested Instruction D, the trial judge stated that the language of the proposed instruction "goes too far."

## II. ANALYSIS

### A.  Standard of Review for Assignments of Error I-IV (Jury Instructions)

"A reviewing court's responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'"  Darnell v. Commonwealth, 6 Va. App. 485, 488, 370 S.E.2d 717, 719 (1988) (quoting Swisher v. Swisher, 223 Va. 499, 503, 290 S.E.2d 856, 858 (1982)).  The trial court has "broad discretion in giving or denying instructions requested," and we review those decisions under an abuse of discretion standard.  Gaines v. Commonwealth, 39 Va. App. 562, 568, 574 S.E.2d 775, 778 (2003) (en banc).  "If the principles set forth in a proposed instruction are fully and fairly covered in other instructions that have been granted, a trial court does not abuse its discretion in

refusing to grant a repetitious instruction." Joseph v. Commonwealth, 249 Va. 78, 90, 452

S.E.2d 862, 870 (1995). However, whether a proffered jury instruction accurately states the law

is reviewed *de novo*. Sarafin v. Commonwealth, 288 Va. 320, 326, 764 S.E.2d 71, 74 (2014).

"When reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence

in the light most favorable to the proponent of the instruction." Commonwealth v. Vaughn, 263

Va. 31, 33, 557 S.E.2d 220, 221 (2002).

## B. Jury Instructions

### 1. Instructions on Malice (Assignments of Error I and II)

Code § 18.2-144 states in relevant part:

> Except as otherwise provided for by law, if any person maliciously
> shoot, stab, wound or otherwise cause bodily injury to . . . any
> horse, mule, pony, cattle, swine or other livestock of another, with
> intent to maim, disfigure, disable or kill the same . . . he shall be
> guilty of a Class 5 felony.

Appellant argues that the term "malice," as it appears in Code § 18.2-144, has a different

meaning than in other sections of the Code that describe crimes against a person, see, e.g., Code

§ 18.2-51 (defining malicious wounding of a person), because pigs are routinely slaughtered for

food. Therefore, appellant contends, the instruction providing the definition of malice was

incomplete without appellant's recommended language in Jury Instruction B – that the act was

done with a "wicked and corrupt motive" and an "evil mind."[5]

While Code § 18.2-144 does not explicitly define "malice," "[i]t is a common canon of

statutory construction that when the legislature uses the same term in separate statutes, that term

has the same meaning in each unless the General Assembly indicates to the contrary."

---

[5] Appellant relies on State v. Burgess, 516 S.E.2d 491 (W. Va. 1999), to support her proposed instruction. There, the Supreme Court of Appeals of West Virginia found that the defendant did not act maliciously when he shot a farmer's cow because the action was not "evil and cruel." Id. at 494. Not only is Burgess not controlling in Virginia, but the facts in Burgess and in the case before us are quite different.

Commonwealth v. Jackson, 276 Va. 184, 194, 661 S.E.2d 810, 814 (2008). If the General Assembly intended for "malice" to have a different meaning in the context of the malicious killing of livestock, it would have stated so, or it could have chosen a different word entirely. See id. at 194, 661 S.E.2d at 815 ("[C]ourts 'assume that the legislature chose, with care, the words it used when it enacted the relevant statute.'" (quoting Barr v. Town & Country Properties, Inc., 240 Va. 292, 295, 396 S.E.2d 672, 674 (1990))).

Jury Instruction 10, which the trial court gave, mirrors the language of the Virginia Model Jury Instruction on malice and has been approved by the Supreme Court of Virginia. See Thomas v. Commonwealth, 279 Va. 131, 160-61, 688 S.E.2d 220, 237 (2010); 2-53 Model Jury Instrs.—Crim. No. 33.220. Because Jury Instruction 10 was an accurate statement of the law, we cannot say that the trial court abused its discretion by granting the Commonwealth's instruction and refusing to include appellant's proposed language. See Gaines v. Commonwealth, 39 Va. App. 562, 568, 574 S.E.2d 775, 778 (2003) (en banc) ("The defendant's instruction was no more or less correct than the instruction given. While it 'was a correct statement of the legal principles involved and the trial court, in its discretion, could properly have given the instruction, it does not follow that it was reversible error to refuse it.'" (quoting Lincoln v. Commonwealth, 217 Va. 370, 375, 228 S.E.2d 688 692 (1976))).[6]

---

[6] During the jurors' deliberation of the case, one of the jurors sent a note to the trial judge, asking, "Does the jury have discretion to deviate from the definition of malice per instruction No. 10?" The judge responded, "No," and sent the note back to the jury. Because we conclude that the trial court did not err in refusing appellant's additional requested instruction, we need not address appellant's argument on brief that the juror's question demonstrated that the jury was "constrained to find her guilty according to the definition of malice provided by the court." Furthermore, the Supreme Court and this Court have made clear that a question posed by a juror during deliberations "cannot be extrapolated into a binding factual finding by the jury as a whole." Kennemore v. Commonwealth, 50 Va. App. 703, 709, 653 S.E.2d 606, 609 (2007). Accord Dominguez v. Pruett, 287 Va. 434, 442, 756 S.E.2d 911, 915 (2014).

Further, appellant contends that the trial court committed error by issuing Jury Instruction 11, which permitted the jury to infer malice from the use of a deadly weapon, unless the jury had a reasonable doubt as to the existence of malice. Appellant argues that the instruction was not appropriate in this case because a deadly weapon will inevitably be used in the slaughter of livestock and the slaughtering of livestock is, of course, generally not a crime. She cites Winckler v. Commonwealth, 155 Va. 1146, 1150, 156 S.E. 364, 365 (1931), in support of this position.

In Winckler the trial court issued the following jury instruction: "[I]f they (the jury) believe from the evidence that the accused struck the cow with a deadly weapon, the presumption of the law is that he unlawfully intended to maim, disfigure, and kill the cow." Id. at 1149, 156 S.E. at 365. On appeal, the Supreme Court reversed because it noted that the presumption had relieved the Commonwealth from its burden to prove Winckler's intent. Id. at 1150-51, 156 S.E. at 365. Here, unlike in Winckler, the trial judge instructed the jury on a permissive inference, which did not relieve the Commonwealth of its burden of persuading the jurors that malice existed. See Kelly v. Commonwealth, 8 Va. App. 359, 374, 382 S.E.2d 270, 278 (1989). Here, the jury could infer, *but it was not required to presume*, malicious intent based on the use of a deadly weapon to kill the pig right outside the Charlottesville-Albemarle SPCA. Therefore, we cannot say that it was an abuse of discretion to issue Jury Instruction 11 to the jury.

2. Instructions Defining "Willful" and "Cruel" (Assignments of Error III and IV)

Regarding the charge of cruelty to animals, the trial court issued Jury Instruction 15 to the jurors. It was similar to the language of Code § 3.2-6570(A). Instruction 15 stated in relevant part:

> The defendants are charged with the crime of animal cruelty. The Commonwealth must prove beyond a reasonable doubt one of the

following:  (1) that the defendants knowingly tortured, ill-treated, abandoned, or willfully inflicted inhumane injury or pain not connected with bona fide scientific or medical experimentation on any animal, whether belonging to himself or another; or (2) that the defendants cruelly or unnecessarily beat, maimed, mutilated, or killed an animal, whether belonging to himself or another; or (3) that the defendants willfully set foot, instigated, engaged in, or in any way furthered any act of cruelty to any animal; or (4) that the defendants caused any of these acts.  If you find from the evidence that the Commonwealth has proved beyond a reasonable doubt any of the above elements of the crime as charged, then you shall find the defendants guilty . . . .

Appellant argues on brief that "the intentional slaughter of a livestock animal created a situation where the plain meaning of the statute was not sufficient to guide the jury."  She contends that "this case is extremely unique because the killing of the pig is not the crime" and therefore, it was necessary in this particular case for the jury to find that appellant actually *intended* for the pig to suffer when she and Oakes killed it.  Thus, appellant contends that her proposed Instructions C1 and D were necessary to define the terms "willful" and "cruel."

The trial court did not abuse its discretion in refusing to offer these instructions to the jury because, as the trial court found, the plain language of the statute was sufficient to instruct the jury on all issues which the evidence fairly raised.  Appellant seems to argue that, because livestock is routinely slaughtered, additional instructions were necessary to define the terms in the statute in order to avoid potentially criminalizing lawful killings of livestock (*e.g.*, on farms or in stockyards).  However, in this case, appellant did not kill the pig on a farm or in a stockyard. [7]  In this case, the appellant assisted in killing the pig right outside of an animal shelter, the Charlottesville-Albemarle SPCA, in a manner that the testimony established was inconsistent with approved methods of slaughter.  Given the extraordinary circumstances of the

_____

[7] We also note that Code § 3.2-6570(D) provides, "This section shall not prohibit authorized wildlife management activities or hunting, fishing or trapping as regulated under other titles of the Code of Virginia, including Title 29.1, or to farming activities as provided under this title or regulations adopted hereunder."

killing, we find no error in the trial court's conclusion that additional definitions for these terms were not necessary in this particular case and that the jury instruction actually given adequately instructed the jury on the law and all issues which the evidence fairly raised. See Darnell, 6 Va. App. at 488, 370 S.E.2d at 719.

In addition, both appellant's proposed Jury Instructions C1 and D were derived from appellate court opinions. "Virginia courts have often cautioned against lifting the 'language of a specific opinion' for a jury instruction given that an appellate opinion 'is meant to provide a rationale for a decision -- and may not translate immutably into jury instructions.'" Seaton v. Commonwealth, 42 Va. App. 739, 753-54, 595 S.E.2d 9, 16 (2004) (quoting Va. Power v. Dungee, 258 Va. 235, 251, 520 S.E.2d 164, 173 (1999)). In Pelloni, the case from which appellant extracted her proposed definition of "willful," this Court examined several definitions of the word in order to determine if a defendant's neglect of a puppy was sufficient to uphold his conviction for "willfully inflict[ing] inhumane injury or pain" in violation of Code § 3.2-6570(F) (animal cruelty of a companion animal). Because the issue in Pelloni was the defendant's *failure* to act, a thorough examination of the word "willful" and its application to omitted acts was necessary. Here, where the conduct at issue was indisputably voluntary and intentional, the definition in the jury instruction that was proposed by appellant was unnecessary. See Seaton, 42 Va. App. at 754, 595 S.E.2d at 16 (rejecting the need for defendant's definition of "intimidation" as "words or conduct 'placing the victim in fear of bodily harm'" because "[i]n the context of the evidence they heard . . . the jurors no doubt understood that this was the

particular meaning of the term being applied to this case").[8] Therefore, the trial court did not abuse its discretion in declining to give this proposed instruction.

The trial court also did not err in refusing to instruct the jury on Jury Instruction D. Appellant argues that the requested jury instruction was necessary to clarify the *mens rea* for animal cruelty, drawing from the decision of the District of Columbia Court of Appeals in Dauphine v. United States, 733 A.3d 1029, 1032 (D.C. 2013), which found the required *mens rea* to be "general intent with malice." Appellant contends that the "requirement of an evil state of mind or a malevolent purpose is what is lacking in the instructions provided by the trial court in the instant case." However, requested Jury Instruction D is not an accurate statement of Virginia law because Virginia does not require the jury to find that the defendant acted with a "malevolent purpose" in order to sustain a conviction for animal cruelty. In Pelloni, this Court found that the evidence was sufficient to convict Pelloni of animal cruelty, even though the evidence may not have shown that his failure to act was "for the purpose of inflicting Hannibal [the puppy] with 'pain or inhumane injury.'" Pelloni, 65 Va. App. at 744, 781 S.E.2d at 373. It was sufficient that Pelloni "created a situation . . . which [made] it not improbable that injury [would] be occasioned, and [he knew], or [was] charged with the knowledge of, the probable results of [his] acts." Id. (alterations in original) (quoting Barrett v. Commonwealth, 268 Va. 170, 183, 597 S.E.2d 104, 111 (2004)).

Therefore, we find that Jury Instruction 15 was sufficient to instruct the jurors on the law and the issues fairly raised regarding the charge of animal cruelty, and we find the trial court did not err in refusing the appellant's proposed Jury Instructions C1 and D.

---

[8] We also note that appellant's proposed definition of the word "willful" is inconsistent with her argument. Appellant's proposed jury instruction would not have required the jury to find that the appellant intended for the pig to suffer because the requested instruction provided that an act can actually be willful when it simply involves "inexcusable carelessness."

## C. Harmless Error Analysis (Assignment of Error V)

In assignment of error V, appellant argues that the trial court erred in excluding statements allegedly made to her by Officers Wallace and Clark. Appellant argues that the trial court incorrectly ruled that these statements were hearsay because the statements were offered to show their effect on appellant, not to prove the truth of the matters asserted.[9]

We assume, without deciding, that the trial court erred in excluding the proffered statements as hearsay. However, even if the trial court should have admitted the testimony, we find that any error in excluding this portion of appellant's testimony was harmless.

When confronted on appeal with what may be error in the trial court, we are required by statute to conduct a harmless error analysis. See Code § 8.01-678; see also Ferguson v. Commonwealth, 240 Va. ix, ix, 396 S.E.2d 675, 675 (1990) (where the Supreme Court stated that, under Code § 8.01-678, "harmless-error review [is] required in *all* cases"). "Absent an error of constitutional magnitude, 'no judgment shall be arrested or reversed' when 'it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached . . . .'" Kirby v. Commonwealth, 50 Va. App. 691, 698, 653 S.E.2d 600, 603 (2007) (quoting Code § 8.01-678). Under a non-constitutional harmless error standard,[10] an error is harmless if it has not "substantially influenced the jury." Clay v. Commonwealth, 262 Va. 253, 259, 546 S.E.2d 728, 731 (2001). The Supreme Court has also stated, "If other evidence of guilt is so overwhelming and the error insignificant, by comparison, supporting a conclusion that the error did not have a substantial effect on the

---

[9] Appellant also contends on brief that the testimony was necessary to impeach the officers' testimony. However, appellant did not make this argument before the trial court and is, therefore, barred by Rule 5A:18 from making this argument on appeal.

[10] Appellant argues that the trial court erred in not admitting the excluded testimony, but she does not allege a constitutional error beyond the exclusion of what she claims is properly admissible testimony.

verdict, the error is harmless." Angel v. Commonwealth, 281 Va. 248, 268, 704 S.E.2d 386, 398 (2011).

Here, overwhelming evidence supported appellant's convictions. Appellant argues on brief not only that the trial court committed error here but also contends that not allowing appellant to testify regarding the officers' statements was not harmless error because it "is impossible to say that information would not have swayed the jury's decision with regard to whether she acted with malice and with cruelty when she and Oakes ended up slaughtering the pig themselves." However, even if appellant had the police officers' "permission" to take the pig, that information would have no bearing on whether her actions were malicious or cruel. It is not disputed that appellant went to the car to obtain Oakes's hunting knife after they had been unsuccessful – and highly frustrated – in their efforts to control the pig and after the pig bit Oakes's foot through his boot. Appellant then held the pig while Oakes used that same knife to stab the pig more than thirty-one times. Appellant assisted Oakes in this effort to kill the pig right outside the shelter, next to its parking lot, causing the pig to bleed to death. Even if appellant somehow believed that she could take the pig home with her, that belief did not provide an excuse for appellant's actions – as she held the squealing pig outside of the SPCA while Oakes stabbed it over thirty-one times in the neck. The evidence was more than clear that appellant acted in violation of the animal cruelty statute and the malicious wounding of livestock statute.

In addition, any error in excluding the evidence was insignificant with respect to the requirement that the livestock maliciously killed must be the livestock "of another." The evidence at trial proved that the pig did belong to another individual (Jose Zimora, who testified at appellant's trial) – and that it was given by the officers into the temporary care of the shelter – not to the appellant individually. Evidence was presented that the officers brought the pig to the

shelter in order to leave it in the shelter's care. At the time Officers Clark and Wallace left and entrusted the pig to the shelter, the SPCA staff filled out the shelter's standard custody form, which is required by the Virginia Department of Agriculture and Consumer Services for every animal that enters the shelter. Officer Clark also signed a receipt for the custody of the pig, which stated, in relevant part, "I understand by my signature below that the agency listed above is transferring all custody/property rights of the described animal(s) on this form to the Charlottesville-Albemarle SPCA." The officers were, of course, not the owners of the pig and they could not have transferred ownership of the pig to appellant. The evidence clearly establishes that the pig, which had been left with and entrusted to the shelter, was *not* – under any stretch of the imagination – appellant's pig. Therefore, we find that any error that the trial court may have committed – by omitting testimony of statements that the police officers made to appellant – was harmless because the evidence of appellant's guilt of these two crimes was overwhelming.

### D. Sufficiency of the Evidence (Assignment of Error VI)

Appellant also argues that the evidence was insufficient to convict appellant "because appellant did not act with malice or willful cruelty." On appeal, we are required to view the evidence in the light most favorable to the Commonwealth because it was the prevailing party in the trial court. Riner v. Commonwealth, 268 Va. 296, 330, 601 S.E.2d 555, 574 (2004). When considering the sufficiency of the evidence on appeal, "a reviewing court does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Crowder v. Commonwealth, 41 Va. App. 658, 663, 588 S.E.2d 384, 387 (2003) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)). "We must instead ask whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Id. (quoting Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc*)).

"This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Kelly, 41 Va. App. at 257-58, 584 S.E.2d at 447 (quoting Jackson, 443 U.S. at 319).

So viewed, the record reflects that appellant and Oakes were not the owners of the pig that they killed. Rather, the subject pig was the property "of another." Nevertheless, they attempted to hogtie the animal so that they could take it home with them. When the animal resisted, by biting Oakes through his boot, Oakes instructed appellant to get his hunting knife from his vehicle, which appellant promptly did. Appellant then held the animal as it thrashed and kicked while Oakes repeatedly stabbed the pig more than thirty-one times in the neck with his hunting knife. Oakes's hacking and cutting of the animal's neck resulted in numerous wounds, including one particularly gruesome wound that was approximately five inches long, one and a half inches wide, and approximately three and half inches deep. The appearance of this wound led Animal Control Officer Crickenberger to surmise that it was made in an apparent attempt to "decapitate the pig." Appellant also admitted in her testimony that she believed the animal did suffer during this botched apparent attempt at a quick "slaughter." In short, the police brought a pig that had been running loose in a residential neighborhood to the shelter, and they entrusted it to the shelter. Appellant and Oakes then willfully and maliciously killed a pig that did not belong to them right outside the SPCA and animal shelter to which the pig had been entrusted.

The trial court instructed the jurors that:

> A principal in the second degree is a person who is present, aiding and abetting, by helping in some way in the commission of the crime. Presence and consent alone are not sufficient to constitute aiding and abetting. It must be shown that the defendant intended his words, gestures, signals or actions to in some way encourage, advise, or urge, or in some way help the person committing the

- 18 -

crime to commit it. A principal in the second degree is liable for the same punishment as the person who actually committed the crime.

See Farmer v. Commonwealth, 61 Va. App. 402, 414-15, 737 S.E.2d 32, 39 (2013). Thus, even though appellant did not personally wield the knife and inflict any of the numerous wounds that the pig sustained, the jury could find – based upon her actions of retrieving the knife for Oakes and then holding the pig as Oakes stabbed it over thirty-one times – that she acted as a principal in the second degree and that she was guilty of the malicious killing of the pig and of animal cruelty.

Given the totality of the circumstances, we certainly cannot say that no rational factfinder could have found appellant's actions to have been malicious, willful, and cruel. Furthermore, we also certainly cannot say that no rational factfinder could have found that there was sufficient evidence to convict appellant of animal cruelty and of the malicious killing of the pig of another.

CONCLUSION

In the Commonwealth of Virginia, the raising of livestock – in many instances for the later purpose of slaughter – is a substantial portion of the economy. Our holding in this particular case should not be interpreted in any way as somehow criminalizing the lawful conduct of the thousands of individuals (be they farmers, butchers, or otherwise) or businesses that routinely slaughter livestock, which they lawfully possess, in the normal course of their daily business. Rather, our opinion in this case bears specifically on the bizarre decision and conduct of appellant and her co-defendant, who decided to kill an animal – which was not theirs – in the yard and parking lot of the local SPCA and animal shelter, where appellant was then employed.

We find that the jury instructions issued by the trial court were accurate statements of law that were sufficient to guide the jurors in their deliberations. The trial court did not abuse its discretion in refusing to issue appellant's proposed Jury Instructions B and C1 because the jury

instructions it gave correctly and adequately described the law. The trial court also did not abuse its discretion in issuing Jury Instruction 11, which accurately informed the jury that malice could be inferred from the use of a deadly weapon. Finally, the trial court also did not err in refusing to issue Jury Instruction D because it inaccurately stated the law in Virginia.

We assume without deciding that the trial judge erred by excluding, as hearsay, testimony regarding statements made by Officers Wallace and Clark to appellant. However, the exclusion of this testimony from the record was harmless, given the overwhelming evidence that showed that appellant was guilty of animal cruelty and the malicious killing of the pig of another. Finally, given that the evidence of appellant's guilt was overwhelming, we certainly cannot say that no rational factfinder could have found that the evidence was sufficient to convict appellant of animal cruelty and of the malicious killing of the pig of another. Consequently, for all of these reasons, we affirm appellant's convictions.

<u>Affirmed.</u>