COURT OF APPEALS OF VIRGINIA

Present:  Judges Russell, Friedman and Callins
Argued at Salem, Virginia

**UNPUBLISHED**

MEGAN LIN HARNER

MEMORANDUM OPINION*
v.       Record No. 0756-21-3              JUDGE FRANK K. FRIEDMAN
JUNE 28, 2022

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF ROCKBRIDGE COUNTY
Christopher B. Russell, Judge

Neill Wente for appellant.

Mason D. Williams, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


This is a case about the mistreatment of a family pet—specifically the appeal involves

application of a recently amended statute which makes torturing or willfully inflicting inhumane

injury on a companion animal a felony, even if the animal survives the abuse.  The question here

is whether evidence of defendant's inaction and lack of care to the dog's grievous condition

satisfied the elements of the statute to support her felony conviction.

The trial court, in a bench trial, convicted Megan Lin Harner ("Harner") of felony animal

cruelty in violation of Code § 3.2-6570(F).  She challenges the trial court's denial of her motion

to strike, arguing the evidence was insufficient to support a willful infliction of inhumane injury,

or torture of the animal.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)).  In doing so, we discard any of Harner's conflicting evidence, and regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence.  *Id.* at 473.

Shortly past midnight on January 15, 2020, Deputy K. Gosney ("Gosney") was dispatched to Raphine, Virginia to perform a welfare check on three children in a vehicle.  Gosney identified the vehicle and stopped it for an expired registration.  When Gosney approached the vehicle, he observed Harner's husband, Richard Huffman ("Huffman") in the driver's seat, Harner in the front passenger seat, and three children under the age of five in the back seat.  The car was overflowing with refuse, clothes, and miscellaneous items, and smelled strongly of feces, urine, and trash.  There was a heavy odor of fecal matter that spread ten to fifteen feet from the vehicle.  Gosney could not see a dog initially, but at some point the animal moved and his head poked through some of the material covering him.

Sergeant Southers ("Southers") and three other officers assisted Gosney at the scene.  Southers also noted that the terrible odor coming from the vehicle was "hard to describe."  After the children exited the vehicle, Southers heard whining and observed a dog's nose protruding from a pile of trash and a blanket on the floorboard behind the driver's seat.  When Harner removed the dog from the car, dog feces and urine were visible in the area where the dog had been lying, and "it was very obvious that something was hanging from the dog's testicles."  The dog had been sitting in feces, urine, trash, and dirt.  Trash and bags were piled on top of the dog.

The animal could not move his back legs and appeared to be partially paralyzed. Huffman and Harner told the police that the dog was theirs and had been struck by a car a week ago.

Another police officer, Deputy Tomlin ("Tomlin"), arrived at the scene. Tomlin refused a car search for the first time in his nine-year career because "the smell coming from the car was overwhelmingly nauseating to me. I felt like I was going to vomit once we opened the doors."

Similarly, Deputy Sheriff R. Knick ("Knick"), who worked with animal control, refused to remove the animal from the vehicle when he arrived, because the car was so "filthy and disgusting." After Harner removed the pet, Knick photographed the dog and transported him to a veterinary clinic for treatment. Knick testified that the dog's odor was "awful." It was so bad that Knick was "gagging," and despite the cold January night, he was forced to lower his windows and wear a mask.[1]

The veterinarian who examined the dog, Dr. Walter Logan, described the dog as a beagle or beagle mix weighing twenty-five to thirty pounds. The dog's name was Roscoe. Dr. Logan testified that the dog had suffered a back injury and "had no feeling from [its] mid back thoracic lumbar area. The whole back half of the dog was basically dead and he was wet and covered with necrotic skin and [was] very putrid." Roscoe did not have fecal control and had stool "running out of his back end." The dog "had urine [and] . . . feces all over it," and his tissue and skin were "pretty much rotting off." Dr. Logan stated that Roscoe's penis was "very swollen, black, necrotic, rotting off" to the point that it was "almost . . . unusable." He indicated that, if an animal sat in urine and feces "for an extended period of time," he would develop "tremendous burns from the acidity of [the urine]," and the tissue would degrade from the moisture. He

---

[1] Because officers on the scene were, understandably, repelled by the conditions in the car, Harner retrieved the dog from behind the driver's seat. Officers recounted that she spoke kindly to the dog and he seemed comforted to see her. There was no evidence of fear or ill-will between them. Evidence also revealed that the dog was not malnourished.

opined that sitting in urine and feces increased the likelihood of a serious, life-threatening infection, and noted that Roscoe had, in fact, already developed an infection. Roscoe had no cognitive function at this point, and was probably not in a lot of pain, though he was "alert."

Dr. Logan observed that, if the dog had been seen earlier, he could have undergone "intense neurological surgery" to decompress the spinal cord and stabilize his vertebrae, but when Dr. Logan saw him, treatment was no longer an option. Such medical care would have been quite expensive. Although death was not imminent when Dr. Logan examined Roscoe, he stressed that, based on the condition of the dog's tissue, "death would have been oncoming at some point in the near future," necessitating the need to euthanize the animal. Dr. Logan noted that, separate and apart from the dog's back injury, his "swollen penis" and "rotting flesh" were "serious injuries." Dr. Logan conceded that Roscoe had no reflexes and likely was not in substantial pain; however, he emphasized that the dog had no quality of life and, at the direction of animal control, he euthanized it. He explained that, had a person brought the dog into him in that condition, he would have called the police and gotten animal control involved himself per his ethical obligations.

At the conclusion of the evidence, the trial court convicted Harner of felony animal cruelty under Code § 3.2-6570(F).[2] The trial court stressed that "the case [did not] rest on a failure to take the dog to the vet when it needed to be taken to the vet." Instead, it found that "the case rest[ed] on willfully putting th[e] dog in the condition the dog was in when the dog was found." The court also stated the treatment of the dog amounted to torture and sentenced Harner to two years' imprisonment with all but two months suspended. This appeal followed.

---

[2] Harner's husband, Huffman, was similarly charged and convicted of violating Code § 3.2-6570(F).

## STANDARD OF REVIEW

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

## ANALYSIS

Harner was convicted of violating Code § 3.2-6570(F). That statute states in pertinent part:

> Any person who (i) tortures, willfully inflicts inhumane injury or pain not connected with bona fide scientific or medical experimentation, or cruelly and unnecessarily beats, maims, or mutilates any dog or cat that is a companion animal whether belonging to him or another and (ii) as a direct result causes serious bodily injury to such dog or cat that is a companion animal . . . or the euthanasia of such animal on the recommendation of a licensed veterinarian upon determination that such euthanasia was necessary due to the condition of the animal is guilty of a Class 6 felony. . . .

Code § 3.2-6570(F).

Harner assigns only one error—the motion to strike the evidence was denied in error "because the evidence was insufficient to establish that [she] tortured or willfully inflicted

inhumane injury on a companion animal."[3]  Harner's arguments break down to claims that:

(1) her conduct did not amount to torture or infliction of inhumane injury; and (2) her inaction or

lack of care for Roscoe does not constitute "willful" conduct—and that, in any event, the

Commonwealth failed to present sufficient evidence of willfulness or wrongful conduct.  We

find that the evidence was sufficient to support her conviction.

> <u>The Evidence was Sufficient to Establish Willful Infliction of Inhumane Injury Upon
> the Companion Animal.</u>

Code § 3.2-6570(F) makes either torture *or* willfully inflicting inhumane injury *or*

unnecessarily beating, maiming or mutilating a dog or cat that is a companion animal a felony if

the mistreatment leads to serious bodily injury or euthanasia of the animal.[4]  Harner's challenge

to her conviction focuses on the language in subsection F requiring a showing of "torture" or

"willful infliction" of "inhumane injury" upon the companion animal to sustain her conviction.  She

suggests that inaction, omissions of care, or "deliberate indifference," as allegedly occurred here, are

not the sort of inhumane conduct or "willfulness" that was intended to be codified as felonious.  She

argues that she did not "intentionally" inflict any harm on the dog.

The legislative history of Code § 3.2-6570(F) offers some context in analyzing Harner's

claims.  A version of Code § 3.2-6570 has been enacted since 2008, and subsection F previously

required that an animal die because of its injuries for the action to constitute a felony.  However,

---

[3] Though the beagle was euthanized, the parties acknowledge that the euthanasia was recommended, at least in part, because of the dog's paralysis, which is not attributed to any neglect by Harner.  In oral argument Harner agreed that her assignment of error only addressed the "torture or willful infliction of inhumane injury" language as raised in romanette one of subsection F.

[4] The statute employs the disjunctive "or," meaning that any of the three prongs of Code § 3.2-6570(F)(i) may satisfy that element of the offense.  *See Williams v. Commonwealth*, 61 Va. App. 1, 8 (2012) ("[T]he use of the disjunctive word 'or,' rather than the conjunctive 'and,' signifies the availability of alternative choices." (alteration in original) (quoting *Rose v. Commonwealth*, 53 Va. App. 505, 514 (2009))).

Code § 3.2-6570(F) was amended in 2019 to allow a felony conviction, even if the animal survived its injuries. While it is clear that the statutory language permits felony punishment for active abuse such as torture, mutilation, or maiming of companion animals, Harner questions whether the language employed by the legislature is also broad enough to include acts of omission or deliberate indifference.

A. Acts of Omission Can Constitute Willfulness Under the Statute.

The Commonwealth relies heavily on *Pelloni v. Commonwealth*, 65 Va. App. 733 (2016), to support the position that Harner's treatment of the dog satisfies the "willfulness" component of the statute. In *Pelloni*, which predates the 2019 amendment of subsection F of Code § 3.2-6570, the allegations against the appellant included his lack of care for several dogs, including his failure to provide food and water. *Id.* at 736. A puppy in the appellant's care was found to have died because of several factors, including a general lack of care and veterinary treatment, though the primary factor was "severe starvation." *Id.* at 737. The appellant argued that the evidence against him did not prove he acted willfully, because it failed to prove his intent. *Id. a*t 737-38. Noting that the phrase "willfully inflict" was not defined either by statute or in case law interpreting the animal cruelty statute, we analyzed the term as used in other criminal contexts. *Id.* at 738-43. In *Pelloni*, we found that the appellant had acted voluntarily with a consciousness that "inhumane injury or pain" would result given that he was the caregiver for the animals, he lived in the same vicinity as the animals, the puppy slowly starved to death over two to three weeks, the puppy was infested with parasites, there was no food or water available to the puppies, appellant was responsible for providing food and water, and he watched

the sick puppy die and did not take him for treatment, when all of the dog's ailments were preventable. *Id.* at 743-44.[5]

In *Pelloni* we stated: "A voluntary act becomes willful, in law, only when it involves conscious wrong *or* evil purpose on the part of the actor, *or at least inexcusable carelessness*, whether the act is right or wrong." *Id.* at 739 (second emphasis partially added) (quoting *Willful, Black's Law Dictionary* (10th ed. 2014)). Often, "'willfulness' must be established through circumstances." *Correll v. Commonwealth*, 42 Va. App. 311, 325 (2004), *aff'd*, 269 Va. 3 (2005). "Circumstantial evidence is as acceptable to prove guilt as direct evidence, and in some cases, such as proof of intent or knowledge, it is practically the only method of proof." *Abdo v. Commonwealth*, 64 Va. App. 468, 476 (2015) (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)). "While no single piece of evidence may be sufficient, the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion [of guilt].'" *Rams v. Commonwealth*, 70 Va. App. 12, 37 (2019) (quoting *Stamper v. Commonwealth*, 220 Va. 260, 273 (1979)).

We determined in *Pelloni*, as we do here, that to violate Code § 3.2-6570, a defendant need not intend to inflict "inhumane injury or pain" upon the animal, but the evidence must support a rational finding that he or she "created a situation . . . 'which [made] it not improbable that injury [would] be occasioned, and [she knew], or [was] charged with the knowledge of, the

---

[5] Neither *Pelloni* nor this opinion stands for the proposition that simply failing to take an animal for medical treatment or euthanasia, particularly because of an inability to pay for it, constitutes a violation of Code § 3.2-6570. The totality of the circumstances must be considered. Here, we are not unmindful of the fact that Harner faced financial challenges to providing veterinary service to her dog for both his car accident injuries and subsequent necrosis. However, the fact-finder could reasonably infer that the dog had not been cleaned or moved from a fetid pool of filth in quite some time, and these conditions led to its finding that Harner had the requisite intent and willfulness.

probable consequences of [her] acts.'" *Pelloni*, 65 Va. App. at 743 (alterations in original) (quoting *Barrett v. Commonwealth,* 268 Va. 170, 184 (2004)).

Here, a rational fact-finder could easily conclude that Harner created a situation which made it not improbable that injury to Roscoe would occur, and she knew, or was charged with the knowledge of, the probable consequences of her acts. For example, Harner knew Roscoe had been struck by a car and was unable to walk and defecate normally, thereby forcing him to urinate and defecate where he lay. Based on the dog being covered in urine and feces, the strong stench the dog emitted, and the general squalor of his surroundings in the car, a rational fact-finder could conclude that Harner had taken very few steps to keep Roscoe clean after he was paralyzed, though she knew the probable consequences of her acts. A fair inference from the numerous photos of the car was that the dog had been denied basic hygiene for an extended time, that he was left to dwell in pools of his own urine and feces, and was significantly paralyzed from a prior accident so that he could not escape the horrific conditions.[6] Dr. Logan testified that lying in excrement for "an extended period of time" could cause the dog's skin to degrade, leading to infection, and that the dog had, in fact, developed an infection that would eventually cause his death. Despite obvious signs that Roscoe's genitalia were rotting, Harner allowed the dog to continue to lie in his own excrement. As in *Pelloni*, the evidence was sufficient to prove beyond a reasonable doubt that Harner "willfully" inflicted injury on the dog. Code § 3.2-6570(F).

---

[6] The court used words like "abhorrent," "appalling," and "ungodly" to describe the conditions in the car. He observed that "to call it squalor . . . is almost insulting to the term squalor." The court stated that the conditions "shocked the conscience."

B.  "Inhumane Injury" and "Serious Bodily Injury" are Present Here.

Harner argues that she did not torture or willfully "inflict inhumane injury" on her pet.[7]

While the statute utilizes the phrases "inhumane injury" and "serious bodily injury," "inhumane" is not defined.  "Serious bodily injury" is defined as follows:

> For the purposes of this subsection, "serious bodily injury" means bodily injury that involves substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.

Code § 3.2-6570(F).  Harner does not challenge that Roscoe suffered "serious bodily injury"— and the veterinarian, Dr. Logan, provided specific testimony that the dog's injuries arising from his mistreatment satisfied the criteria for serious bodily injury—"protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member."  We are left to determine whether the conduct and omissions by Harner in dealing with the animal constituted willful infliction of "inhumane injury."

---

[7] As noted above, a conviction under the statute can rest upon either "torture" or the "willful infliction of inhumane injury" prong.  The Commonwealth, on appeal, distances itself from the court's comment that she "tortured" the animal and focuses on the court's finding that Harner had "willfully" placed the dog in the situation where the terrible injury was likely to occur.  We think this is a reasonable posture from the Commonwealth, as all accounts show that Harner and the dog appeared to be on good terms with each other when the police arrived.  She removed the dog from the car and comforted him—and Roscoe responded favorably to her.  Where a fact-finder bases its conviction on multiple, disjunctive prongs, each of which is sufficient to support the conviction, the prosecution only needs to prevail on one prong to uphold the conviction.  *See supra* n.4.  "Torture" connotes persecution, malice, or ill-will on a sadistic or heightened level.  *See Torture, Webster's Third New International Dictionary* (1961) ("the infliction of intense pain [to] punish or coerce [or] . . . to give sadistic pleasure to the torturer").  The Commonwealth's focus on the statute's "willful infliction of inhumane injury" prong is more in keeping with the facts at issue—and it is sufficient, standing alone, to uphold the conviction.  In any event, "[w]hen a defendant challenges on appeal the sufficiency of the evidence to sustain his conviction, the appellate court has a duty to examine all the evidence that tends to support the conviction" regardless of the trial court's stated bases for its ruling.  *Bolden v. Commonwealth*, 275 Va. 144, 147 (2008).

"We must determine the General Assembly's intent from the words appearing in the statute, unless a literal construction of the statute would yield an absurd result." *Pelloni*, 65 Va. App. at 739 (quoting *Schwartz v. Commonwealth*, 45 Va. App. 407, 450 (2005)). "We examine a statute in its entirety, rather than by isolating particular words or phrases. When the language in a statute is clear and unambiguous, we are bound by the plain meaning of that language." *Schwartz*, 45 Va. App. at 450 (quoting *Cummings v. Fulghum*, 261 Va. 73, 77 (2001)). "When interpreting and applying a statute, [courts] assume that the General Assembly chose, with care, the words it used in enacting the statute." *City of Richmond v. Virginia Elec. & Power Co.*, 292 Va. 70, 75 (2016) (alteration in original) (quoting *Kiser v. A.W. Chesterton Co.*, 285 Va. 12, 19 n.2 (2013)). Therefore, we must read the statute "so as to give reasonable effect to every word." *Id.* (quoting *Lynchburg Div. of Soc. Servs. v. Cook*, 276 Va. 465, 483 (2008)).

"[W]hen the General Assembly has used specific language in one instance, but omits that language or uses different language when addressing a similar subject elsewhere in the Code, we must presume that the difference in the choice of language was intentional." *Id.* (quoting *Zinone v. Lee's Crossing Homeowners Ass'n*, 282 Va. 330, 337 (2011)). Given these rules of statutory interpretation, we analyze the significance in the legislature's usage of the term "inhumane injury" which must necessarily mean something different than "serious bodily injury."

*Pelloni* did not specifically define inhumane injury; but it did hold that starving the puppy and denying it basic care—acts of omission—constituted "willful infliction of inhumane injury" under Code § 3.2-6570(F).[8] The Commonwealth posits that "inhumane" within the parameters of this statute means the injury is caused with a level of severity or aggravation beyond a normal

---

[8] *Pelloni* was decided prior to a 2019 amendment to Code § 3.2-6570(F) providing for a felony conviction even if the animal survives its injuries. However, the term "willfully inflicts inhumane injury" was contained in the prior version of the Act and was reviewed in *Pelloni*, *Pelloni*, 65 Va. App. at 738.

injury.  The Commonwealth further suggests that "willfully" relates to intent, the phrase "inhumane injury" relates to the manner in which the infliction of injury is imposed, and "serious bodily injury" relates to the nature and severity of the injury.[9]  The Commonwealth offers the example that physical discipline may be required to stop a dog from attacking—but this would not necessarily be "inhumane."

We agree that there are cases in which companion animals will receive "serious bodily injury" through means where no abusive or even wrongful intent is at issue, such as a surgical procedure.[10]  We believe that the term "inhumane" was employed to distinguish cases in which an animal suffers serious bodily injury, where the infliction itself was not "inhumane" or uncivilized.  For example, a sleepy driver can be deemed to have "willfully" caused an accident by driving without proper rest.  *See Conrad v. Commonwealth*, 31 Va. App. 113, 121 (1999). Thus, a sleepy driver might "willfully" inflict serious bodily injury on an unseen dog that he strikes—but this would not necessarily be an inhumane act.  The same could be said for an owner whose dog is injured accidently during friendly roughhousing or in a hunting mishap.

Although Harner's actions were omissions of care, they led to uncivilized conditions which she knew or should have known would directly cause "serious bodily injury" to Roscoe. Consistent with *Pelloni*, the fact-finder could properly determine that Harner's actions "inflicted inhumane injury" under the facts of this case.

---

[9] Inhumane means "not humane."  *Inhumane*, *Webster's, supra* n.7.  "Humane" means "marked by compassion, sympathy, or consideration for other human beings or animals." *Humane*, *supra.*

[10] Because "serious bodily injury," by definition in Code § 3.2-6570(F), includes injury that involves "protracted loss or impairment of the function of a bodily member, organ, or mental faculty," spaying or neutering an animal might be challenged as willfully inflicting serious bodily injury if the "inhumane" qualifying language were not present.

- 12 -

C.  Harner's Claim that the Commonwealth's Evidence Failed to Support the
Conviction is Not Supported by the Record.

Harner also challenges the Commonwealth's lack of evidence as to what kind of care

Roscoe actually received in the week after he was paralyzed.  She suggests there is no evidence

of whether the beagle was, in fact, washed, removed from the pool of excrement, or even taken

to a vet.  She observes that it was the Commonwealth's burden to prove what happened—and

argues that its evidence is insufficient.  She suggests that in the absence of a detailed timeline of

Roscoe's status and treatment, the Commonwealth improperly seeks to shift the burden to her to

disprove guilt arising from the pet's injuries.  Harner, however, fails to recognize the strength of

the prosecution's evidence and the related inferences flowing from it.  The medical evidence and

the photos of the conditions in the car are sufficient to permit a fact-finder to conclude that

Roscoe was left in acidic pools of excrement long enough to cause massive burning and rotting

of his flesh.  Though we do not know the exact period of time in which Roscoe was forced to lie

in his own waste, the circumstantial evidence and veterinary testimony establish that it was an

"extended period of time"—long enough for the dog's skin to substantially decay.  The

fact-finder stated that conditions in the car were "appalling," "abhorrent," and "shocked the

conscience."

Harner also points out that Roscoe was not able to feel pain due to his paralysis and that

he was well fed.  She argues that he was not "suffering," according even to the Commonwealth's

veterinary witness.  Again, these are factual arguments which a fact-finder could rely upon—but

which the fact-finder in this case deemed unpersuasive.  Here, the companion animal was left to

waste away under piles of debris, while in pools of his own excrement.  Dr. Logan testified that

Roscoe's genitalia were swollen to four times a usual size and was in an "almost unusable

condition."  He described the necrosis as "serious."

- 13 -

While not every fact-finder may have found that Harner's actions, or inactions, amounted to willful infliction of inhumane injury, the evidence presented against Harner was sufficient to allow a rational fact-finder to conclude, beyond a reasonable doubt, that Harner willfully inflicted both inhumane injury and serious bodily injury upon the dog. We find no error in the trial court's denial of the motion to strike.

CONCLUSION

The evidence here was sufficient to convict Harner under Code § 3.2-6570(F). The language of the statute is broad enough to support a conviction based on inaction or omission where that conduct: "(i) willfully inflicts inhumane injury . . . [upon] any dog or cat that is a companion animal . . . and (ii) as a direct result causes serious bodily injury to such dog or cat . . . . " Code § 3.2-6570(F). The elements of the offense are met on this record. Accordingly, the judgment of the trial court is affirmed.

*Affirmed.*